SUSAN M. PFEIFER, Indiv., and as Special Adm'r of the Estate of Steven M. Pfeifer, Deceased, Plaintiff-Appellant, v. CANYON CONSTRUCTION COMPANY, INC., Indiv., and d/b/a Canyon Equipment Company, Inc., Defendant-Appellee.

Second District No. 2—93—0031

Opinion filed December 20, 1993.—Rehearing denied January 25, 1994.

Law Offices of Harlovic & Perko, of West Dundee (Phyllis J. Perko, of counsel), for appellant.

Kevin Michael Weldon, of Wildman, Harrold, Allen & Dixon, of Waukegan (David F. Pardys, of counsel), for appellee.

JUSTICE BOWMAN delivered the opinion of the court:

Plaintiff, Susan Pfeifer, brought this action for the wrongful death of her husband, Steven Pfeifer. She appeals from an order of the circuit court of Lake County granting the motion of defendant, Canyon Construction Company (Canyon), for a directed verdict. Plaintiff asserts on appeal that the trial court erred in: (1) excluding evidence of admissions by defendant; (2) directing a verdict for the defendant at the close of plaintiff's case; and (3) barring certain evidence of loss of support.

Briefly, the basic facts underlying this action are as follows. Steven Pfeifer worked for Canyon, primarily as a truck driver. There was conflicting evidence regarding the extent to which he also helped to service the company's vehicles and equipment. The Pfeifers lived in McHenry, over an hour's trip from Canyon's yard in Chicago. While Steven normally drove his own car to work, on July 14, 1988, his car was not working so he drove a Ford F-250 truck belonging to the company. Steven worked late into the night of July 14 and left the company yard about 2 o'clock the next morning. On the way home he apparently pulled the truck into an abandoned gas station parking lot to park and rest or sleep before completing the trip. The weather was hot and humid, and later investigations showed that the keys were in the ignition, the ignition switch was on, the air conditioning was set for maximum cooling, and the fan switch was at the low setting. At some point during the early morning hours a fire broke out in the engine compartment of the truck, and Steven was asphyxiated due to inhalation of the products of combustion from the fire. Additional relevant facts will be included in the discussion of the issues.

With regard to the cause of the fire, in her third amended complaint plaintiff alleged essentially that the exhaust system of the Ford

F-250 truck had been modified; in the process of modification the fuel lines had been rerouted over the steering shaft; as a result of the rerouting, the fuel lines came into contact with and were subjected to wear by the turning of the steering shaft; one of the fuel lines eventually failed and gasoline or gasoline vapors leaked into the engine compartment and were ignited. As to the liability of defendant, the complaint basically alleged that Canyon knew of the rerouting of the fuel lines since it had either performed certain modifications of the exhaust system itself or had directed someone else to do the work; Canyon knew or should have known that rerouting the fuel lines could ultimately result in a fire which might injure the user of the truck; and Canyon had a duty, but negligently failed, to warn Steven Pfeifer of this dangerous condition at the time the truck was loaned or entrusted to him.

Following the presentation of plaintiff's case to a jury, Canyon moved for a directed verdict. Rejecting all other grounds urged by the defendant, the trial court found that plaintiff's evidence that Canyon had actual knowledge that the fuel lines had been rerouted and that a danger of fire had thereby been created was not sufficient to withstand the motion for directed verdict. The motion was granted, and plaintiff's subsequent motion for a new trial was denied. This appeal followed.

██ Plaintiff first contends that the trial court erred in refusing to admit evidence of admissions purportedly made by defendant in portions of the pleadings and in answers to interrogatories. The determination of the admissibility of evidence is a matter of trial court discretion and should not be reversed absent an abuse of that discretion. (*Skelton v. Chicago Transit Authority* (1991), 214 Ill. App. 3d 554, 577.) We have carefully reviewed those sections of defendant's answer to the third amended complaint which are cited by plaintiff and find that defendant did, indeed, make a number of admissions of fact. Statements of fact admitted in an answer become judicial admissions which bind the party making them. (*Dixon v. City of Chicago* (1981), 101 Ill. App. 3d 453, 455; *Western Life Insurance Co. v. Chapman* (1975), 31 Ill. App. 3d 368, 372.) Accordingly, defendant's admissions, which were binding, were already part of the record. Plaintiff did not need to make them part of her case.

More significantly, despite plaintiff's suggestions to the contrary, none of the cited admissions concerned matters in dispute. For example, Canyon admitted the allegations that it was an Illinois corporation, that it owned the 1976 Ford truck, and that it had had a header exhaust system installed on the truck. Defendant also admitted, in re-

sponse to paragraph four of the complaint, that it was in the construction business, that it owned trucks and construction equipment, and that certain maintenance work was sometimes done on its vehicles by Canyon employees. As will be shown, none of these allegations were disputed. Moreover, all of them were the subject of other evidence produced at trial, as was the allegation made in defendant's affirmative defense, that Steven Pfeifer had died as a result of inhaling the by-products of a fire in the engine compartment. Consequently, had defendant's admissions been admitted they would have been, to varying degrees, cumulative of other evidence which was introduced at trial. Under the circumstances, the exclusion of the admissions found in defendant's answer did not constitute reversible error.

With regard to the answers to interrogatories, defendant does not dispute that such answers may be admissible as admissions. However, defendant asserts, and we find, that the answers at issue here, like the admissions discussed above, were often not relevant to the issues raised. Purported admissions must be relevant to and have a material bearing on the issues of the case. (*Bargman v. Economics Laboratory, Inc.* (1989), 181 Ill. App. 3d 1023, 1029.) Once again, the answers cited by plaintiff related to undisputed matters which were not issues in the case and/or were cumulative of other evidence. Specifically, defendant gave responses concerning its ownership of the Ford truck; various modifications that had been made to the truck; Steven Pfeifer's employment as a truck driver for Canyon; and the fact that Hank Disharoon, who supervised Canyon, gave Steven permission to use the truck prior to the night Steven died. There was no dispute about any of these facts, and other evidence was produced to show all of them.

Defendant also challenges many of the cited interrogatory answers on the ground that they do not amount to admissions but are merely neutral statements which neither admit nor deny anything. We agree with defendant's characterization of its answers. In response to a question about records of work done on the truck defendant stated, "Records of routine maintenance do not exist." Similarly, defendant answered that the location of service records, repair receipts and the like for the truck was "unknown." Despite plaintiff's attempt to construct an argument otherwise, we do not perceive these answers as admissions of anything but as neutral replies to the interrogatory questions. The *Bargman* court determined that such statements were properly excluded from evidence. *Bargman*, 181 Ill. App. 3d at 1029.

Plaintiff urges that the answers described above conflict with testimony, as well as other interrogatory answers, which tend to show

that Henry Disharoon, who ran the company, required that records be kept. However, in *Bargman*, which was an injury case, the court also excluded a discovery response which conflicted with the defendant's answer to the complaint. In *Bargman* one of the defendant's employees testified in his deposition that he did not know what caused the plaintiff's accident. Plaintiff argued that since defendant, by its answer, denied plaintiff's allegations as to the cause of the accident, the employee's deposition testimony was relevant because he was responsible for investigating the accident and yet he admitted he did not know what caused it. Despite this asserted relevance, the *Bargman* court found that the deposition statement amounted to nothing more than a neutral statement. Like the *Bargman* court, we perceive the answers given to interrogatories here to be neutral statements rather than admissions of anything. Consequently, the trial court did not abuse its discretion in excluding them.

■ We turn next to plaintiff's contention that the lower court erred in directing a verdict at the close of her case. The general standard for directing a verdict is found in *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, and states that such verdicts may be entered only if all of the evidence, when viewed most favorably to the nonmovant, so overwhelmingly favors the movant that no contrary verdict could ever stand. *Pedrick* involved primarily direct evidence. Plaintiff in this case presented only circumstantial evidence on the issue of Canyon's actual knowledge of the dangerous condition in the truck Steven Pfeifer was using when he died. Defendant's knowledge goes to the issue of whether it had a duty to warn Steven. Duty, in turn, is an element of a negligence action, which may be established by either direct or circumstantial evidence. *Mort v. Walter* (1983), 98 Ill. 2d 391, 396; *Wilson v. Bell Fuels, Inc.* (1991), 214 Ill. App. 3d 868, 873.

■ The use of circumstantial evidence is not limited to situations where the circumstances support only one logical conclusion but will suffice whenever an inference can reasonably be drawn from such evidence. (*Mort*, 98 Ill. 2d at 396; *Moore v. Swoboda* (1991), 213 Ill. App. 3d 217, 233.) Facts established by such inferences are considered when a directed verdict is sought. (*Mort*, 98 Ill. 2d at 396-97; *Barkei v. Delnor Hospital* (1988), 176 Ill. App. 3d 681, 693.) Hence, for purposes of a directed verdict, the absence of direct evidence of Canyon's knowledge is not fatal to plaintiff's case. The question is whether the inferences reasonably drawn from the circumstantial evidence, and the facts determinable from the inferences, when viewed most favor-

ably to plaintiff, so heavily favor Canyon that a contrary verdict could not stand.

■ Before we analyze and determine the sufficiency of plaintiff's evidence, we must address the parties' discussion of the burden of proof regarding the element of knowledge. Plaintiff cites the Restatement (Second) of Torts §388, at 301 (1965), which states in relevant part that one who supplies chattel for another to use is liable to the other if he or she:

"(a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied."

The defendant challenges plaintiff's reliance on the "knows or has reason to know" language of the Restatement, insisting that plaintiff's objective is to expand her theory of recovery beyond what is recognized in Illinois. Defendant maintains that it was merely a gratuitous bailor when it loaned the truck to Steven Pfeifer and, as such, had a duty to warn only of those defects of which it had actual knowledge.

■ Plaintiff does not contest defendant's statement of the law with regard to gratuitous bailments. Rather, she asserts that the term "has reason to know" merely allows for proof of actual knowledge by the use of circumstantial evidence. Defendant, in turn, states in its brief that it does not dispute plaintiff's contention that actual knowledge can be established by circumstantial evidence in the absence of direct evidence. Evidently, defendant has difficulty, not with the fact of using circumstantial evidence, but with the amount or quality of the circumstantial evidence produced in this case. It appears the parties do not really disagree, and we conclude that plaintiff was required to produce evidence of actual knowledge on Canyon's part in order to succeed in this action. A gratuitous bailor is liable for injury caused by a defect in his chattel only if he has actual knowledge of the defect. (See *McMaster v. Zwicker* (1990), 194 Ill. App. 3d 923, 926; *Rynders v. Sangamo Construction Co.* (1982), 103 Ill. App. 3d 552, 556.) As explained above, that plaintiff's evidence was circumstantial rather than direct is not, in and of itself, enough to defeat her cause.

Having decided that the use of circumstantial evidence was appropriate, we now must determine whether plaintiff's evidence regarding Canyon's knowledge of the defect was adequate to survive a motion for a directed verdict. It was not disputed that defendant owned the Ford F-250 Truck. Defendant had purchased the vehicle new in factory stock condition approximately two years before the fire that killed Steven Pfeifer. Nor was it disputed that defendant controlled

the truck at all relevant times and entrusted it to the decedent. Canyon was engaged in the construction industry and also owned other vehicles and construction equipment. Henry Disharoon, who was intimately involved in all aspects of operation of Canyon, was responsible for buying and selling defendant's vehicles and equipment, and it was he who gave permission for Canyon employees to use company vehicles. Henry Disharoon died in April 1990, prior to trial.

The proof demonstrated that Canyon employees performed maintenance and repair work on the company's vehicles, although the nature and extent of such work was not altogether clear. Shelly Disharoon, Henry's daughter, worked for Canyon. She testified that the company had a yard with mechanics who would fix the trucks, except for major repairs which were sent out to a truck dealer or the like. While the evidence was conflicting as to whether the company had a truck maintenance foreman, Shelly Disharoon testified that the truck drivers would perform some maintenance and repair tasks themselves. Rory King, who had been a truck driver for Canyon, indicated that if the trucks broke down the drivers would go to the boss and get the parts and fix the vehicles themselves. Gail Disharoon, Henry's wife, testified that her husband had some knowledge of mechanical equipment repair and knew how to weld. Paul Gibson, Canyon's labor foreman at the time, testified that he also was a welder, that he had done welding for Canyon, and that Canyon had acetylene torches that could be used to weld.

The evidence also established that there had been substantial modifications made on the Ford F-250 truck from the time of its purchase. Most significantly, although other theories were explored during his cross-examination, plaintiff's expert testified on direct examination that the fuel lines had been moved from their factory stock position and routed around the steering shaft. There was evidence of many other changes as well. Inside the engine compartment the stock exhaust manifolds had been replaced with headers, the air pumps and evaporated emission control system had been removed, the vacuum lines had been plugged off, the air cleaner assembly snorkel had been removed, and the air cleaner cover had been inverted. The exterior of the truck had been modified with a push bumper and custom grille assembly. The inside contained three nonfactory gauges mounted in the dashboard area.

One of the headers that had replaced the stock exhaust manifolds had itself been modified. The evidence showed that Don Veretto had done the original replacement work at his service garage in Albuquerque, New Mexico, about four months after Henry Disharoon pur-

chased the 1986 Ford truck. The Disharoons moved to Illinois from New Mexico on November 1, 1986. Veretto testified that the modified header had an acetylene torch weld on one of its four tubes that indicated a replacement of that tube after the time the header was manufactured. He indicated that the header would have to have been removed to create the weld, a difficult and time-consuming job. According to the witness, the header modification work had been done after the truck left his shop. Cumulatively, the evidence tended to show that Veretto had not made any of the other modifications, either. Veretto also testified that he was not required to modify or move the fuel lines in order to install a header such as the one on the Ford truck.

Of all the modifications to the mechanical components of the vehicle, the only one that could be identified as to place, time, and responsibility was Veretto's replacement of the exhaust manifolds with the headers. Plaintiff produced evidence of Veretto's bill, as well as Canyon's payment, for the work. There was no evidence that the remaining modifications to the Ford F-250 had been done by anyone other than Canyon.

Collectively, the evidence shows that the truck in which Steve Pfeifer died had been extensively modified, much of that modification occurring in the engine compartment. Defendant, who owned and controlled the truck from the time it was purchased until the time of the fatal fire, was actively involved in the servicing and repair of all of its vehicles. It appears that some routine maintenance and parts replacement were performed by the truck drivers themselves. However, there was also evidence the company employed mechanics to keep up its vehicles. Defendant also had both the tools and the skills to perform more substantial repairs involving welding. No records were able to be produced of anyone other than Veretto working on the Ford truck, and Veretto testified he would not have rerouted the fuel lines. We agree with plaintiff that a reasonable jury could infer from this evidence that Canyon knew about the changes made to the fuel lines because Canyon had made the change itself. The alternative inference urged by plaintiff is likewise reasonable, i.e., that Canyon knew about the defect because, in the course of servicing and repairing the vehicle, it discovered the condition after it was created by a third party.

Reasonable inferences favorable to plaintiff arise from the evidence; thus, it is not fatal that other inferences, even though unfavorable to plaintiff, may also be drawn. (Mort, 98 Ill. 2d at 396.) In sum, when the evidence, circumstantial though it may be, is viewed most

favorably to plaintiff, we do not find it to be such that a verdict for the plaintiff could never stand (*Pedrick*, 37 Ill. 2d at 510). We opine that the trial court erred in directing a verdict for the defendant at the close of plaintiff's case.

Plaintiff's next argument relates to damages. Defendant filed a motion *in limine* seeking to bar evidence of loss of consortium and support to Steven Pfeifer's wife from the date of her remarriage. Plaintiff conceded loss of consortium as an element of damages but contested the motion as to loss of support. The court granted the motion in its entirety.

At trial plaintiff offered expert testimony on the economic loss to the estate of Steven Pfeifer. However, the expert did not take into consideration the remarriage of the decedent's widow. Noting that his testimony was subject to cross-examination, the court allowed the witness to continue but indicated that defendant would be entitled to an instruction that the jury could not consider loss of support to the wife from the time of her remarriage. The court also refused to allow redirect examination on the question of why the expert did not include the fact of remarriage in his calculations. Plaintiff contends the trial court was wrong in granting the motion *in limine*. Since this matter will most likely recur upon remand, we will resolve it.

Plaintiff looks initially to *Watson v. Fischbach* (1973), 54 Ill. 2d 498, where the court examined the propriety of referring to a surviving spouse's remarriage at a trial for the wrongful death of a deceased spouse, with regard to its relevancy in determining damages. The court stated:

> "A very substantial majority of the jurisdictions which have considered the *** question have held that remarriage of the surviving spouse, or the possibility thereof, does not affect the damages recoverable for the wrongful death of the deceased spouse. [Citations.] This view prevails in Illinois [citations], and we have no reason to question its validity." (*Watson*, 54 Ill. 2d at 500.)

Plaintiff takes the position that, under *Watson*, her claim for loss of support did not abate when she remarried.

Defendant, on the other hand, relies on *Dotson v. Sears, Roebuck & Co.* (1990), 199 Ill. App. 3d 526, where the court held that, for purposes of determining damages of a surviving spouse in a wrongful death action, a claim for loss of material services is part of a loss of consortium claim and, as such, terminates upon remarriage. Defendant's reliance on *Dotson* is misplaced.

In *Elliott v. Willis* (1982), 92 Ill. 2d 530, our supreme court held that loss of consortium is included as an element of damage, or "pecuniary injur[y]," as that term is used in section 2 of the Wrongful Death Act (740 ILCS 180/2 (West 1992)). Prior to *Elliott*, damages for loss of consortium had not been recoverable in wrongful death actions. Subsequently, in *Carter v. Chicago & Illinois Midland Ry. Co.* (1985), 130 Ill. App. 3d 431, 436, the court acknowledged *Elliott* but held that damages for loss of consortium were limited to loss up to the time of remarriage. Then, in *Dotson v. Sears, Roebuck & Co.* (1987), 157 Ill. App. 3d 1036, 1043-44 (*Dotson I*), and *Dotson v. Sears, Roebuck & Co.* (1990), 199 Ill. App. 3d 526, 529-31 (*Dotson II*), our brethren in the first district held that a claim for loss of material services was a component of a claim for loss of consortium. The *Dotson* court relied on language in *Elliott* and *Dini v. Naiditch* (1960), 20 Ill. 2d 406, 427-28, for the further proposition that consortium could not be divided into its various components. In other words, damages for loss of any of the individual elements that make up consortium could not be recovered separately; they could be recovered only insofar as they were part of a claim for loss of consortium. Finally, the *Dotson* court followed *Carter* in holding that a claim for material services, since such services were an element of consortium, were limited by remarriage to the same extent as any other element of consortium. Thus, the plaintiff in *Dotson* could not avoid the effect of remarriage on a loss of consortium claim by characterizing his action as one for material services. The defendant here takes the position that, in a wrongful death action, the loss of financial support, like the loss of material services in *Dotson*, is part of loss of consortium and, under *Carter* and *Dotson*, is limited by remarriage of the surviving spouse. Defendant's argument is not persuasive.

The pecuniary damages recoverable under the Wrongful Death Act have traditionally included loss of financial support. (*Hall v. Gillins* (1958), 13 Ill. 2d 26, 31 ("Loss of support is of course an element of damages under the statute"); *McFarlane v. Chicago City Ry. Co.* (1919), 288 Ill. 476, 483-84 (jury instruction properly stated that it is " 'only the pecuniary or money loss which the evidence may show the next of kin have suffered by the death of the deceased' "); Illinois Pattern Jury Instructions, Civil, No. 31.04 (3d ed. 1992).) Thus, the rule reiterated in *Watson*, *i.e.*, that remarriage does not affect the damages recoverable in a wrongful death action, has applied to damages for loss of financial support. Defendant cannot escape the application of the rule by attempting to recast financial support as either a type of material service or as an element of loss of consortium sepa-

rate from but similar to the "material services" which were at issue in *Dotson*.

Consortium has never had the same connotation as financial support. According to Black's Law Dictionary 280 (5th ed. 1979), "[c]onsortium" refers to the "[c]onjugal fellowship" of husband and wife, and the right of each to "the company, society, co-operation, affection, and aid of the other in every conjugal relation." Black's defines "[l]oss of consortium" as "loss of society, affection, assistance and conjugal fellowship, and includes loss or impairment of sexual relations." (Black's Law Dictionary 280 (5th ed. 1979).) In *Dini v. Naiditch* (1960), 20 Ill. 2d 406, the notion of service by a spouse was also discussed as part of consortium. The *Dini* court held for the first time that a wife could recover for loss of consortium due to the negligent injury of her husband. In reaching its conclusion the court explained why, historically, a husband, but not a wife, could bring a loss of consortium action. The rule had developed at a time when all of the wife's property became her husband's upon marriage, and she could neither contract nor bring any kind of action. According to the court:

> "Since the husband was entitled to his wife's services in the home, as he was to those of any servant in his employ, if he lost those services through the acts of another, that person had to respond in damages. [Citation.] *** However, should the husband be injured, the wife, being a legal nonentity [citation] could bring no action. A servant could hardly sue for the loss of services of the master." (*Dini*, 20 Ill. 2d at 422.)

In further discussing the concept of consortium, the court stated:

> "Consortium *** includes, in addition to material services, elements of companionship, felicity and sexual intercourse, all welded into a conceptualistic unity." *Dini*, 20 Ill. 2d at 427.

It was subsequently said by this court, in *Manders v. Pulice* (1968), 102 Ill. App. 2d 468, 474, that Illinois recognizes a husband's claim for loss of consortium where, due to his wife's injuries, he has been "deprived of her services *as his wife*" (emphasis added) and has sustained a loss of her consortium. The wife in *Manders* had been rendered physically incapable of performing normal household chores for at least a five-month period and had experienced a severe change in temperament. The court invoked *Dini* for the components of consortium and added that consortium had also been described as including a person's affections, society and aid.

This court also addressed the concept of consortium, in an action for alienation of affections, in *Coulter v. Renshaw* (1981), 94 Ill. App. 3d 93, 96-97. Whether loss of consortium could be recovered depended

upon whether such loss constituted actual damage. We found that it did not. Citing *Manders* and the components of consortium mentioned there, we concluded that the elements of loss of consortium were the kinds of "indefinitely measured damages" for which the controlling statute was meant to preclude recovery.

In *Elliott* the court observed:

> "The estate and defendants agree that consortium is unique to a marriage partner *(Mitchell v. White Motor Co.* (1974), 58 Ill. 2d 159, 162). It includes society, guidance, companionship, felicity, and sexual relations. *Dini v. Naiditch* (1960), 20 Ill. 2d 406; see *Hall v. Gillins* (1958), 13 Ill. 2d 26." *(Elliott,* 92 Ill. 2d at 535.)

The *Mitchell* court, as cited by *Elliott,* had considered a wife's action for loss of consortium where her husband had been injured. The court said that such an action was based on "an injury to a personal relationship established by the marriage contract." *Mitchell v. White Motor Co.* (1974), 58 Ill. 2d 159, 162.

In another wrongful death action, *Countryman v. County of Winnebago* (1985), 135 Ill. App. 3d 384, 388, this court found evidence of the value of the allegedly lost consortium to be admissible. We again recognized the elements of consortium as set forth in *Dini* and repeated in *Elliott,* noting that they include "such intangibles" as society, guidance, companionship, and sexual relations. We then added, citing *Elliott* (92 Ill. 2d at 539-40), that "[d]espite the nebulousness of the concept of consortium, a jury is capable of determining its monetary worth." *Countryman,* 135 Ill. App. 3d at 388.

The *Carter* court also recognized the unique and personal character of consortium between spouses when, after holding that loss of consortium was limited by remarriage, it said:

> "It may be true, as plaintiff argues, that consortium with the deceased spouse may have been of a different quality from that with the present spouse, but such speculations could lead only to Aristophanes' Nepheloccocygia." *(Carter,* 130 Ill. App. 3d at 436.)

Similarly, the *Dotson* court, which held that material services were a component of a claim for loss of consortium, perceived such services as unique to a marital relationship when it noted that claims for the "personal services" of a spouse have traditionally been recoverable in wrongful death actions. *Dotson,* 157 Ill. App. 3d at 1043.

The concept of consortium, as it emerges from the cases, consists primarily and essentially of intangible elements which are unique, and very personal, to any given marriage. The loss of consortium reflects

the loss of personal benefits and satisfactions the surviving spouse enjoyed as a result of a highly individualized relationship with a particular person. That relationship and those benefits cannot be duplicated. As for material services, we note first that the courts speak of a wife's "services in the home," services "as [the spouse's] wife," and "personal services." The courts' discussions do not include, even by implication, the concept of financial support. Too, while some material services are clearly more tangible in nature than such things as affection and companionship, they are also highly personal to, and generally flow from, the particular relationship between specific spouses. As such, they are properly part of consortium.

In contrast, financial support lost due to the wrongful death of a spouse is totally tangible. Financial support is wholly unlike the elusive and highly personal characteristics of consortium. It does not flow from, is not unique to, and does not depend upon the relationship between particular spouses. In fact, we believe it quite possible for financial support to flourish in a marital relationship even though many elements of consortium may be at low ebb, or even be missing altogether. It appears the *Elliott* court recognized this distinction when it said:

> "It is true that damages for loss of consortium are not capable of being given the detailed in-depth analysis that an expert can call upon to testify about in calculating a decedent's professional worth where future earnings of an individual employed in a particular field can be measured with precision and particularity." (*Elliott*, 92 Ill. 2d at 539-40.)

We conclude that the concept of consortium, personal and intangible as it is, cannot be stretched to accommodate the very tangible and impersonal idea of financial support.

We are aware of language in *Dini* which would appear to require a different conclusion. The *Dini* court was discussing the potential for double recovery in a wife's loss of consortium action due to the fact that the injured husband could also recover for his diminished ability to support his family. In this context the court stated: "This argument emphasizes only one element of consortium—the loss of support." (20 Ill. 2d at 427.) The court then added that consortium includes the intangible elements we discussed above. This one, isolated comment in *Dini* is not enough to change our disposition of this issue.

First of all, the *Dini* court's comment was *dictum*. There was no issue as to whether financial support was an element of consortium. More significantly, though, *Dini* was not a wrongful death case. The *Dini* court held for the first time that a wife could recover for loss of

consortium resulting from injury to her spouse. Hence, unlike this action under the Wrongful Death Act, the action allowed in *Dini* was brand new. Whereas loss of support damages have traditionally been recoverable for pecuniary injury in wrongful death cases, there were no "traditional" damages in the loss of consortium action allowed in *Dini*. Under the circumstances, we do not think the *Dini* court intentionally lumped financial support together with the other elements of consortium. On the contrary, we suspect that if the *Dini* court had been squarely faced with the question of whether financial support was an element of consortium, it might not have made the statement quoted above. Alternatively, if the court did reach the same conclusion, it would have been well supported and soundly reasoned, thus providing authority for us to find otherwise than we do. As it stands, the *Dini* opinion does not dissuade us from our conclusion.

In sum, loss of financial support and loss of consortium are distinct and independent components of the pecuniary damages recoverable under the Wrongful Death Act. Consequently, when plaintiff conceded defendant's motion *in limine* regarding loss of consortium, she did not concede her claim for loss of support. Further, while under *Carter* loss of consortium damages terminate upon remarriage, *Watson* teaches that remarriage is irrelevant to damages for loss of support. Hence, the trial court erred in barring evidence of loss of financial support to Steven Pfeifer's wife from the date of her remarriage.

For the reasons discussed, the order of the circuit court of Lake County granting defendant's motion for a directed verdict is reversed, and this matter is remanded for further proceedings consistent with this opinion.

Reversed and remanded.

WOODWARD and McLAREN, JJ., concur.