FIFTH DIVISION
February 25, 2011

No. 1-09-2633

| | | |
|---|---|---|
| STEVEN TAGLIERE, Individually, and as Natural Guardian of TAIYLOR TAGLIERE, a Minor, | ) ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | |
| WESTERN SPRINGS PARK DISTRICT, a Municipal Corporation, | ) ) ) | Honorable Marcia Maras, |
| Defendant-Appellee. | ) | Judge Presiding. |

JUSTICE HOWSE delivered the judgment of the court, with opinion.

Presiding Justice Fitzgerald Smith and Justice Epstein concurred in the judgment and opinion.

Plaintiff, Steven Tagliere, filed a complaint against the defendant, Western Springs Park District (hereinafter Park District), seeking damages for injuries his minor daughter, Taiylor, sustained while playing on a seesaw owned by the Park District. The circuit court of Cook County determined that the failure of a Park District employee to discover a defect in the seesaw during his regularly scheduled inspections did not constitute willful and wanton conduct and entered summary judgment in favor of the Park District. On appeal, Tagliere alleges the failure of the Park District to discover and correct a defect in the seesaw despite repeated inspections constituted

1-09-2633

willful and wanton conduct as a matter of law and the Park District had actual or constructive knowledge of the defect and the failure to correct the defect constituted willful and wanton conduct. For the reasons set forth below, we affirm the decision of the circuit court.[1]

BACKGROUND

In Tagliere's third amended complaint, he alleges that Taiylor, age seven, sustained a broken ankle on February 9, 2006, while playing on a defective seesaw at a park owned by the Western Springs Park District. Tagliere alleges the manufacturer of the seesaw instructed the Park District on how to inspect and maintain the seesaw. Tagliere also alleges that the seesaw was visibly defective and the Park District's failure to discover the defects on routine inspection and make repairs constituted willful and wanton conduct.

In a discovery deposition, John R. Gleason, the owner of NuToys Leisure Products, Inc., testified that the Park District purchased the seesaw from his company in 1991. The seesaw was manufactured by Landscape Structures, Inc., which sends

[1]Justice Michael P. Toomin originally participated in this case. Oral argument was held on November 9, 2010. However, he has since left this court. Justice James Epstein, in Justice Toomin's stead, has considered the original briefs and record in this matter, has listened to oral arguments, has reviewed the Rule 23 order issued, and now joins in the instant decision rendered above.

-2-

maintenance information directly to the purchasers of the equipment.

Gleason testified that the center of the seesaw has a coil that is attached to the seesaw by four spring clamps held together by four bolts. If the clamps are missing, the seesaw will go up and down farther than it should and a "pinch point" will be created. Gleason testified that a pinch point is a space between two hard objects where a user can become injured.

Gleason testified he inspected the seesaw after the accident and observed it was in disrepair but could not determine for how long. He observed that the spring clamps were not in place, only one of four bolts was in place but was not fastened, and parts of the seesaw contained rust. Gleason testified that the defects in the seesaw were obvious.

Michele Tagliere, Taiylor's mother, testified in a discovery deposition that prior to her daughter's accident, she was not aware of any accidents on the seesaw at the park. On the day of the accident, Michele received a call from Taiylor's school informing her that Taiylor had been injured. Michele went to the school, heard Taiylor screaming, and observed Taiylor's left ankle to be severely injured. Michele called 911 and Taiylor was taken to the hospital. Michele later learned from a neighbor that Taiylor's injury occurred on the seesaw.

1-09-2633

The next morning doctors performed a closed reduction on the broken bones in Taiylor's left ankle. Taiylor was placed in a cast on her left side from her toes up to her waist. Taiylor wore the cast for approximately two months. Taiylor was unable to attend school for approximately two months.

Tagliere testified in a discovery deposition that on the day of Taiylor's accident, he was called to the hospital where he observed Taiylor in the emergency room, heavily medicated, and with her leg in a splint.

Tagliere testified that he was not aware of any complaints about the condition of the seesaw at the park prior to the accident. Tagliere testified that he was aware of complaints regarding playground equipment in other parks prior to the accident but was not aware of any injuries as a result of defective playground equipment.

Tagliere took photographs and video of the seesaw after the accident. At that time, he observed that bolts were missing on the springs of the seesaw but he does not know for how long.

Taiylor testified in a discovery deposition that when the accident happened, five other girls were on the seesaw and she was sitting in a middle seat. Taiylor testified that while the girls rode up and down on the seesaw she was swinging her left foot when she felt pain and fell off the seesaw. Her left ankle

-4-

was caught in the seesaw and she managed to pull it out. Taiylor testified that a "lunch dad" picked her up and a "lunch mom" held her foot.

Taiylor testified that she observed a bolt on the ground by the seesaw prior to her accident. She left the bolt by the seesaw and did not show it to anyone or report it to anyone.

Taiylor testified that she currently feels pain when she plays sports and trips over her left foot when she is running.

Dennis Conway, Western Springs Park District foreman, testified in a discovery deposition that he inspects the playground equipment in 12 village parks once a month. Conway observes each piece of equipment for breaks and wear. If a defect is discovered, the equipment is shut down until it is repaired. Conway keeps a file on each park containing all the original documents that came with each piece of playground equipment, including orders for new parts.

Conway, who has attended classes on playground safety, including instruction on how to inspect playground equipment, testified he had inspected the seesaw at the park both before and after the accident.

Conway viewed photos of the seesaw taken shortly after the accident and observed from the photos that bolts and clamps on the seesaw were missing. Conway testified that when he inspects

the seesaw he uses a check list provided by the manufacturer. He sits on either side of the seesaw and pushes up and down, side to side, "to make sure it looks like it's acting the way it's suppose to perform and then [I] check the handheld rails, all of them, check all of the footrests, and I'll move the seats."

Conway inspected the seesaw approximately two weeks before the accident, on January 25, 2006. He also inspected it after the accident and did not observe any defects. The seesaw was eventually removed to a Park District garage where Conway participated in its repair, including adding brackets to the top of the coils. Conway is not aware of any problems with the seesaw since it was repaired. Conway also has no opinion as to how Taiylor's accident occurred.

On cross-examination, Conway testified that he is not aware of any complaints regarding the seesaw prior to the accident. He also testified that he was not aware that the seesaw was missing the brackets on top of the coils or any bolts at the time of the accident or even that the seesaw needed brackets on its top. He testified that he did not have a sufficient understanding of the design and of the seesaw to determine that it was missing bolts and clamps. Conway testified he and his supervisor Craig Himmelmann were unable to observe a defect on the seesaw after the accident. As a result, they contacted Jack Gleason from

NuToys to help determine the cause of the accident and whether there were defects that needed repair.

The record contains an affidavit from plaintiff's expert engineer Gary Hutter, who possesses a bachelor of science degree in mechanical engineering and a master of science degree in environmental engineering. Hutter has worked for more than 30 years in the fields of mechanical, environmental and safety engineering and currently is employed by Meridian Engineering and Technology Company.

Hutter attested that he inspected the seesaw and opined that it was structurally unsound and in unsafe condition for use by children because bolts were missing from the bolt holes on the U-shaped bracket at the "fulcrum point" of the seesaw where two coil springs are located. The coil springs were missing spring clamps that he opined should have been attached. Hutter opined that because of the defects, gaps were created between the spring coil and the bracket and the gaps increased and decreased in size as the seesaw rose up and down creating a pinch point.

Hutter opined:

> "When the seesaw is in good repair, no pinch points or crush points exist that could catch or trap any part of a child's body."

Steven King, owner of Landscape Structures, Inc., the

manufacturer of the seesaw, testified in a discovery deposition that his company provided installation instructions to the Park District in 1991 when it installed the seesaw. The Park District was provided with a general maintenance inspection sheet containing a checklist to establish a regular routine of inspections.

King testified that in 1991 his company did not test its playground equipment for pinch points but now such testing is standard procedure.

Craig Himmelmann, director of parks for the Western Springs Park District, testified in a discovery deposition that safety inspection of the seesaw involved checking the seats, handholds and foot pegs, to make sure they were tight. They would also rock the seesaw to check for any shifting on the fulcrum. Himmelmann testified that at the time of the accident he was not aware that the seesaw possessed clamps that were attached by bolts to the springs/fulcrum. Himmelmann did not observe empty bolt holes on the seesaw prior to the accident. Himmelmann testified that if he had seen the holes prior to the accident, he would not have known what they were.

Himmelmann testified that after the accident he inspected the seesaw and referred to the installation instructions but could not determine what, if anything, was wrong with the seesaw.

Himmelmann contacted NuToys and was provided a diagram of the seesaw that indicated the seesaw was missing a clamp. Himmelmann was unfamiliar with the term "pinch point" and testified he was unaware that equipment, like a seesaw that contains springs, if improperly installed, could create pinch points.

Himmelmann testified:

"There was no need to check for pinch points because I have been told by NuToys that the coils springs were designed not to pinch."

Himmelmann, who has been employed by the Park District since 1985, testified that when the seesaw was installed in 1991, it arrived pre-assembled. The Park District hired an outside company to complete its installation. Himmelmann testified that he had no reason to believe that the seesaw was not properly installed.

At the end of discovery, including the completion of 11 depositions, the Park District filed its motion for summary judgment alleging it was immune under section 3-106 of the Local Governmental and Governmental Employees Tort Immunity Act (745 ILCS 10/3-106 (West 2008)) (hereinafter Tort Immunity Act). The trial court granted the motion, holding:

"[T]he local public entity is liable only

when it is guilty of willful and wanton

misconduct approximately causing the injury."

The trial court found that willful and wanton misconduct in regards to playground equipment can occur only if the public entity has actual knowledge of a dangerous condition. The trial court stated:

"You must be informed of a dangerous

condition, know that others have been injured

or intentionally removed a safety feature."

The trial court stated that there is no issue of material fact in the case at bar because there is no evidence the park district had actual knowledge that the seesaw was in dangerous condition. Tagliere's motion for reconsideration was denied. This appeal followed.

ANALYSIS

The issue presented for review is whether the trial court erred when it granted summary judgment for the defendant based on its immunity under the Tort Immunity Act (745 ILCS 10/1-101 *et seq*. (West 2008)). We review a trial court's grant of summary judgment *de novo*. *Adamczyk v. Township High School District 214*, 324 Ill. App. 3d 920, 922 (2001).

The purpose of summary judgment is not to try a question of fact but rather to determine whether a genuine issue of material

fact exists. *Williams v. Manchester*, 228 Ill. 2d 404, 416-17 (2008). Summary judgment is proper when the pleadings, affidavits, depositions and admissions of record, construed strictly against the moving party, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Gregory v. Beazer East*, 384 Ill. App. 3d 178, 184-85 (2008). Summary judgment should not be granted unless the movant's right to judgment is clear and free from doubt. *Mitchell v. Special Education Joint Agreement School District No. 208*, 386 Ill. App. 3d 106, 111 (2008).

A triable issue precluding summary judgment exists where the material facts are disputed or where, the material facts being undisputed, reasonable persons might draw different inferences from the undisputed facts. *Williams*, 228 Ill. 2d at 417. Although summary judgment can aid in the expeditious disposition of a lawsuit, it remains a drastic means of disposing of litigation and, therefore, should be allowed only where the right of the moving party is clear and free from doubt. *Williams*, 228 Ill. 2d at 417.

In this case it is undisputed that Taiylor's injuries occurred on Park District property intended for recreational use and that the Park District is a local governmental unit. In

1-09-2633

Illinois, local governmental units are liable in tort on the same basis as private tortfeasors unless a valid statute dealing with tort immunity imposes conditions upon that liability. *LaMonte v. City of Belleville*, 41 Ill. App. 3d 697, 705 (1976) (citing *Krieger v. Village of Carpentersville*, 8 Ill. App. 3d 243, 247 (1972)); *Austin View Civic Ass'n v. City of Palos Heights*, 85 Ill. App. 3d 89, 95 (1980).

The Park District alleged and the trial court found the Park District was immune under section 3-106 of the Tort Immunity Act (745 ILCS 10/3-106 (West 2008)), which provides:

> "Neither a local public entity nor a public employee is liable for an injury where the liability is based on the existence of a condition of any public property intended or permitted to be used for recreational purposes, including but not limited to parks, playgrounds, open areas, buildings or other enclosed recreational facilities, unless such local entity or public employee is guilty of willful and wanton conduct proximately causing such injury." 745 ILCS 10/3-106 (West 2008).

> Willful and wanton conduct is defined in section 1-210

1-09-2633

of the Tort Immunity Act as:

> "[A] course of action which shows an actual
> or deliberate intention to cause harm or
> which, if not intentional, shows an utter
> indifference to or conscious disregard for
> the safety of others or their property.  This
> definition shall apply in any case where a
> 'willful and wanton' exception is
> incorporated into any immunity under this
> Act."  745 ILCS 10/1-210 (West 2008).

In order to establish willful and wanton conduct, a plaintiff must prove that a defendant engaged in a "course of action" that shows an actual or deliberate intention to cause harm or shows an utter indifference to or conscious disregard for the safety of others.  745 ILCS 10/1-210 (West 2008).

I. Failure to Discover the Defect Despite Repeated Inspections

Tagliere alleges the failure of the Park District to discover and correct a defect in the seesaw despite repeated inspections constituted willful and wanton conduct as a matter of law, citing *Winfrey v. Chicago Park District,* 274 Ill. App. 3d 939 (1995).

In *Winfrey*, the plaintiff sought damages for injuries he received on Chicago Park District property.  The park district was immune from liability under the Tort Immunity Act unless the

1-09-2633

park district was guilty of willful and wanton conduct.  After
noting that the Tort Immunity Act includes park districts within
its definition of local public entities, the court discussed
various common law definitions of willful and wanton conduct
discussed in Illinois case law:

"Willful and wanton conduct is not a
static concept. In examining the concept in
the context of a negligence action, the
supreme court recognized that willful and
wanton conduct exists along a continuum; it
may be either intentional or less than
intentional, 'i.e., where there has been "a
failure, after knowledge of impending danger,
to exercise ordinary care to prevent" the
danger, or a "failure to discover the danger
through *** carelessness when it could have
been discovered by the exercise of ordinary
care."' " *Winfrey*, 274 Ill. App. 3d at 944
(quoting *Ziarko v. Soo Line R.R. Co.*, 161
Ill. 2d 267, 274 (1994), quoting *Schneiderman
v. Interstate Tourist Lines, Inc.*, 394 Ill.
569, 583 (1946); citing 3 Richard A. Michael,
Illinois Practice §24.8, at 385-86 (1989)).

-14-

1-09-2633

The supreme court has noted that willful and wanton conduct may be only " 'degrees less than intentional wrongdoing' " or " 'degrees more than ordinary negligence' "; and it has long recognized that willful and wanton is not a concept amenable to precise description. *Winfrey*, 274 Ill. App. 3d at 944 (quoting *Ziarko*, 161 Ill. 2d at 275). In *Myers v. Krajefska*, 8 Ill. 2d 322 (1956), the court explained that while courts had used " 'different wording, language and terminology' " to define willful and wanton, the core element of the term common in all of the cases was that " 'liability can be founded *** where the act was done with actual intention or with a conscious disregard or indifference for the consequences when the known safety of other persons was involved. The knowledge concerning other persons can be actual or constructive. *** It is generally considered in that area of fault between ordinary negligence and actual malice.' " *Winfrey*, 274 Ill. App. 3d at 944-945 (quoting *Myers*, 8 Ill. 2d at 328-29; accord *Lynch v. Board of Education of Collinsville Community Unit District No. 10*, 82 Ill. 2d 415, 429-30 (1980)).

The Park District argues that the common law definitions of willful and wanton in the cases cited by Tagliere are no longer applicable when determining whether the conduct of a public entity constitutes willful and wanton conduct under the Tort Immunity Act. Defendant argues that the Illinois legislature

-15-

1-09-2633

amended section 1-210 of the Act in 1998 to exclude the definitions found in the common law cited by Tagliere. The amendment added one sentence to the statute after it defined willful and wanton conduct:

> "[A] course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property. *This definition shall apply in any case where a 'willful and wanton' exception is incorporated into any immunity under this Act."* (Emphasis added.) 745 ILCS 10/1-210 (West 2008).

The record contains a transcript of the hearings held in the Illinois General Assembly in conjunction with the amendment of section 1-210 of the Act. We note the following exchange:

> "Krause: Is it the intent of this Bill to ensure that the definition of willful and wanton conduct, provided in the Tort Immunity Act, be applied in all cases where a willful and wanton exception is incorporated into the Act?

1-09-2633

                Dart: Yes.  A sentence has been added to the definition of willful and wanton conduct in the Act, clarifying that the statutory definition be used for cases affected by the Act and that other definitions of willful and wanton conduct that may have or will be provided through common laws, shall not be used in such cases."  90[th] Ill. Gen. Assem., House Proceedings, May 20, 1998, at 17 (statements of Representatives Krause and Dart).

The 1998 amendment of section 1-210 of the Act did not change the statutory definition of willful and wanton.  However the legislature, in the amendment, clearly indicated that it requires the use of the statutory definition of willful and wanton to evaluate the conduct of public entities in Tort Immunity cases to the exclusion of common law definitions found in the cases cited by Tagliere.

Under section 1-210, as amended, a public entity is guilty of willful and wanton conduct only where the entity engages in a "course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property."  745 ILCS 10/1-210 (West 2008).

-17-

1-09-2633

In this case, the Park District made repeated inspections of the seesaw prior to Taiylor's injury but failed to discover the defect. Based on the record before us, we cannot say that Conway's failure to discover the defect, even after repeated inspections, constituted actual or deliberate intention to cause harm or shows an utter indifference to or conscious disregard for the safety of others. Conway's failure to discover the defect may be arguably negligent, however, the conduct of the Park District was not willful and wanton, as defined by section 1-210 of the Tort Immunity Act.

Tagliere also alleges that the trial court failed to apply a balancing test to determine whether the Park District's failure to repair the seesaw constituted willful and wanton conduct, citing *Burlingame v. Chicago Park District*, 293 Ill. App. 3d 931 (1997). In *Burlingame*, we held that the question of whether or not the failure of a public entity to discover and repair a dangerous condition on its property constituted willful and wanton conduct could be evaluated using a balance test:

> "We find that this approach can provide
> useful guidance for charges of willful and
> wanton misconduct: a failure to repair a
> dangerous condition may constitute negligence
> whenever the likelihood of severe injury
> outweighs the burden of preventing injury,

-18-

but the same failure constitutes willful and wanton misconduct only if the balance is especially one-sided, as where the likelihood of severe injury is particularly great or the burden of preventing injury is patently small.  Only in cases of such severe imbalances could the failure to act shock the conscience in the manner of willful and wanton misconduct."  *Burlingame*, 293 Ill. App. 3d at 934 (citing *Oravek v. Community School District 146*, 264 Ill. App. 3d 895, 900 (1994)).

Tagliere argues that the defect in the seesaw could have been discovered with relative ease and, therefore, the failure to discover it and make repairs, under the *Burlingame* balancing procedure, constituted willful and wanton conduct.

We note *Burlingame* concerned injuries that were incurred before the 1998 amendment to section 1-210 of the Act.  The 1998 amendment to section 1-210 requires that the statutory definition of willful and wanton be used to evaluate the Park District's conduct in this case, rather than the common law definition and balancing test of the *Burlingame* case.

The balancing test of *Burlingame* is not applicable to this

case because the legislature defined willful and wanton as "a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others." 745 ILCS 10/1-210 (West 2008). The legislature also provided that this was the only definition to be used when evaluating the alleged willful and wanton conduct of public entities under the Tort Immunity Act. The failure of the Park District to discover the defect despite repeated inspections may have been negligent but did not constitute willful and wanton conduct as defined by section 1-210. The trial court was correct to not conduct the *Burlingame* balancing test because the legislature has amended section 1-210 of the Act to eliminate its applicability to this case.

## II. Actual Notice of Dangerous Conditions

Tagliere claims the Park District had actual notice of the dangerous condition of the seesaw because the missing clamps were in place when the Park District received the pre-assembled seesaw in 1991. Tagliere claims that Conway should have observed the missing clamps during his regular inspections. Tagliere argues a reasonable inference can be made that Conway ignored the dangerous condition of the seesaw that existed at the time he performed his inspection in 2005 and 2006. Tagliere claims the failure of the park District to repair the seesaw after knowledge

of the dangerous condition constitutes willful and wanton conduct.

Conway testified that he was not aware that bolts and spring clamps were missing. The record shows Conway is not an engineer and he was unaware that he needed to inspect the spring coils to make sure the clamps were in place. Conway testified that regular inspections of the seesaw consisted of checking the seats, handholds, footpegs and moving the seesaw up and down. The record contains a document titled "Inspection Checklist," which is a sheet of paper containing four empty columns, titled "Play Component," "Inspected," "Problem (if any)" and "Action Taken." The document does not contain columns or checklists for the coils, bolts, spring clamps or pinch points on the seesaw. There is no indication that a person performing inspections on the seesaw, using this document as a guide, would know to check the condition of the coils, bolts, spring clamps, or to look for pinch points.

Conway testified that he did not know that a pinch point could occur on the seesaw. After the accident, Conway inspected the seesaw and could not determine what was wrong with it, nor did he observe a defect.

The record shows that it was not until Conway received a diagram from the seller NuToys, after the accident and after his inspections, that he learned the seesaw was missing two spring

clamps. There is no question that the missing clamps and bolts can be easily observed. However, the record shows that Conway was unable to make a determination that spring clamps were missing until after receiving additional information from the manufacturer after Taiylor's injury. Therefore, we cannot say Conway had actual knowledge the spring clamps were missing prior to Taiylor's injury when he did not know they even existed, and he did not know they needed to be in place, or that the danger of pinch points existed or that he needed to inspect the seesaw for pinch points.

Tagliere next claims there is sufficient circumstantial evidence that the Park District had actual notice of the defects in the seesaw, citing *Pfeifer v. Canyon Construction Co.,* 253 Ill. App. 3d 1017 (1993). Tagliere claims the Park District had actual knowledge of the defects in the seesaw based on circumstantial evidence, like the truck owner in *Pfeifer,* because Conway admitted he inspected the seesaw prior to the accident and other witnesses testified that the dangerous condition was not difficult to detect by a visual inspection.

In *Pfeifer*, the plaintiff's husband died from asphyxiation from fumes produced when the engine of a truck caught fire. *Pfeifer*, 253 Ill. App. 3d at 1019. The engine of the truck had been extensively modified. The fire started when a fuel line had

been rerouted over the steering shaft.  The fuel line failed when it came into contact with moving parts of the steering system and leaked fuel onto the exhaust manifold.

After the plaintiff presented her case, the trial court directed a verdict for defendant, finding there was not sufficient evidence that defendant had actual knowledge that the fuel lines had been rerouted and created a danger of fire. *Pfeifer*, 253 Ill. App. 3d at 1020.  Since defendant was a gratuitous bailor, defendant was liable to plaintiff's decedent only if it knew or had reason to know the truck was dangerous for the use for which it was supplied.

The Second District reversed the trial court, finding that a reasonable jury could infer from the circumstantial evidence that defendant knew about changes made to the truck's fuel lines because: (1) defendant owned and maintained the truck from the time of its purchase; (2) that the evidence showed the truck had been extensively modified after it had been delivered to the defendant; and (3) that the defendant employed mechanics to perform maintenance on the truck and some drivers maintained the truck themselves. *Pfeifer*, 253 Ill. App. 3d at 1025.

However, we cannot say that circumstantial evidence shows the Park District knew of the defects.  The evidence shows the Park District purchased the seesaw pre-assembled and hired an outside company to complete installation.  In contrast, there is

-23-

circumstantial evidence defendant modified the fuel lines in *Pfeifer* because it extensively modified the engine of the truck and evidence shows only defendant's mechanics could have rerouted the fuel line.  Here, there is no evidence the defendant modified the seesaw.  The defects in the seesaw, which consisted of missing parts, were not a modification and were not discernable to Park District staff because they did not possess the requisite knowledge to recognize whether any parts were missing on the seesaw.

The record shows that the second district in *Pfeifer* found that the defendant had the requisite knowledge and tools to modify the fuel lines, unlike the case at bar where the Park District staff did not have the requisite knowledge of the design and make up of the seesaw to perform proper safety inspections, let alone any modifications, which are not even at issue here. Also unlike *Pfeifer*, there is no evidence here, circumstantial or otherwise, that the Park District created the defect or even knew of its existence before the accident.

### III. Constructive Knowledge

Next, Tagliere claims the Park District had constructive knowledge that the seesaw was defective and is therefore liable.

Tagliere cites *Muellman v. Chicago Park District*, 233 Ill. App. 3d 1066 (1992), for the proposition that "[w]here evidence

exists that a public entity has knowledge a dangerous condition can exist on its property, even if it does not regularly conduct inspections, and it fails to take steps to discover and correct the condition, knowledge sufficient for a willful and wanton claim can be imputed to it despite a claim by the public entity that it lacks actual knowledge."

In *Muellman*, plaintiff was injured when she stepped into a large open pipe while walking to an outdoor concert in Chicago's Grant Park. *Muellman*, 233 Ill. App. 3d at 1066-67. An employee for defendant testified that the pipes normally are covered with lids but these lids can be easily removed and are often knocked off by defendant's lawn care equipment. *Muellman*, 233 Ill. App. 3d at 1067. The employee testified he painted some of the pipes yellow and orange so the pipes would be visible to those operating lawn mowing equipment. Another employee testified that he was aware the lids were being stolen.

In affirming judgment for plaintiff, we found that the defendant was aware and acknowledged the danger of the pipes by painting them to avoid damage to its equipment. We also found the defendant "consciously disregarded the safety of the general public by painting only those pipes which they determined could damage defendant's [lawn care] equipment." *Muellman*, 233 Ill. App. 3d at 1069.

Notwithstanding the Muellman injuries occurred before the 1998 amendment to section 1-210 of the Act, the case is distinguishable on the facts. The defendant in *Muellman* knew some lids were stolen and selected some pipes to paint so the operators of lawn equipment could spot them. The defendant, knowing the missing lids were dangerous, made no provision for the safety of pedestrians, leaving them at peril. In contrast, here, there is no evidence the Park District knew the spring clamps were missing from the seesaw.

In sum, we cannot say the trial court erred when it determined there was no evidence the Park District's conduct demonstrated an utter indifference to or a conscious disregard for the safety of others. At most, the failure of Conway to discover the missing spring clamps during his inspection was negligent. However, we cannot say the Park District showed an utter indifference to or conscious disregard for the safety of others or that it was informed, either through actual or constructive notice, of a dangerous condition on the seesaw. There is no evidence the Park District knew or should have known others had been injured because of the condition, or that it intentionally removed a safety device or feature from the seesaw. 745 ILCS 10/1-210 (West 2008). As a result, we cannot say the trial court erred in granting defendant's motion for summary judgment.

## CONCLUSION

We affirm the order granting summary judgment by the circuit court.

Affirmed.