# Illinois Official Reports

## Appellate Court

*In re Estate of Stewart*, 2016 IL App (2d) 151117

| | |
|---|---|
| Appellate Court Caption | *In re* ESTATE OF JEFFREY STEWART, Deceased (Mary Stewart, Individually and as Special Administrator of the Estate of Jeffrey Stewart, Deceased, Plaintiff-Appellee, v. Oswego Community Unit School District No. 308, Defendant-Appellant). |
| District & No. | Second District<br>Docket No. 2-15-1117 |
| Filed | August 24, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Kendall County, No. 08-L-75; the Hon. Timothy J. McCann, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | J. Timothy Eaton and Jonathan B. Amarilio, both of Taft Stettinius & Hollister LLP, of Chicago, for appellant.<br><br>Bradley A. Skafish and Jeffrey S. Deutschman, both of Deutschman & Associates, P.C., of Chicago, for appellee. |
| Panel | JUSTICE JORGENSEN delivered the judgment of the court, with opinion.<br>Presiding Justice Schostok and Justice Spence concurred in the judgment and opinion. |

**OPINION**

¶ 1        In February 2008, 18-year-old Jeffrey Stewart collapsed and died during English class at Oswego Community High School. According to the autopsy report, the cause of death was asthma. Stewart's teacher, Stacy Harper, ran to Stewart's side and told two students to go by foot to the other side of the building to get the nurse, but, contrary to school policy, Harper did not call or have someone call 911 for another 7 to 20 minutes.

¶ 2        Plaintiff, Mary Stewart, Stewart's mother, individually and as administrator of his estate (Estate), filed the instant tort suit, alleging, *inter alia*, that Harper, as an agent of defendant, Oswego Community Unit School District No. 308 (District), acted willfully and wantonly in responding to Stewart's collapse. She also alleged that other agents of the school acted willfully and wantonly, particularly with regard to training Harper. The District moved for summary judgment, arguing, *inter alia*, that it was immune from these claims pursuant to section 2-201 of the Local Governmental and Governmental Employees Tort Immunity Act (Act), which provides absolute immunity for policy determinations made with discretion. 745 ILCS 10/2-201 (West 2008). The trial court denied the motion. It found, as a matter of law, that Harper exercised his discretion, but it could not find, as a matter of law, that Harper made a policy determination. Absolute immunity aside, the court stated that a question of fact remained as to whether the agents acted willfully and wantonly. The case proceeded to trial on the question of willful and wanton conduct.

¶ 3        Following trial, the jury returned a $2.5 million verdict in favor of the Estate. The court denied the District's earlier motion for a directed verdict and its posttrial motions for judgment notwithstanding the verdict (judgment *n.o.v.*) and, alternatively, a new trial.

¶ 4        The District appeals, arguing that the trial court erred in (1) denying its motion for a new trial based on insufficient evidence of willful and wanton conduct (and denying its motions for a directed verdict and judgment *n.o.v.* on the same basis); (2) issuing a jury instruction that was not supported by the evidence; and, earlier, (3) denying summary judgment based on section 2-201 absolute immunity and allowing the case to proceed to trial. As to the main issue of whether the evidence supported the willful-and-wanton finding, the District contends that, although Harper's response to Stewart's collapse might have been misguided, he demonstrated care rather than "utter indifference," and therefore, he cannot have acted willfully and wantonly. We disagree that the jury was required to consider only Harper's initial actions of sending for the nurse and running to Stewart's side; instead, it may have found determinative his subsequent *in*action of waiting 7 to 20 minutes to call or have someone call 911. The jury also may have considered conduct prior to the collapse. Thus, we allow the jury's verdict to stand, and we affirm the trial court's judgment.

¶ 5                                                    I. BACKGROUND
¶ 6                                                 A. The Estate's Case
¶ 7        The Estate presented the following witnesses: Mary Stewart, Lisa Robb (Stewart's aunt), Jocelyn Stewart (Stewart's sister), Jill Weber (the supervisory nurse), Harper, Jacob Pellegrine (student), Alex Gates (student), Kyle Moser (student), Jacqueline Wojtyszyn (coteacher), Loren Carrera (deputy coroner), and Dr. Coleman Robert Seskind (medical expert).

## 1. Mary, Robb, and Jocelyn

Mary testified that Stewart had asthma since age 15. Stewart had gone to the emergency room three times for his asthma. Mary informed the District that Stewart had asthma.

Robb testified that after he turned 18, Stewart chose to live with her so that he could attend the District's schools. In the "comments" section of Stewart's school health form, Robb reported that Stewart had asthma, and she listed albuterol as his medication. Despite writing "asthma" in the comments section, she did not check a box for "asthma." She did check a box for "heart murmur/high blood pressure."

Jocelyn testified that she lived with Stewart for 18 years, until he went to live with their "auntie." Stewart was her only sibling. She was five years older than Stewart, and she testified, as had Mary and Robb, that she loved Stewart very much. She and Stewart liked to sing, dance, and be silly together. Stewart helped Jocelyn fix her computer, and Stewart told Jocelyn that he wanted to find a job fixing computers. Jocelyn once witnessed Stewart have an asthma attack. Her mother ran to get his inhaler, and after several seconds, Stewart returned to his normal state.

## 2. Weber, on School Policy and the Incident

Weber was the health services coordinator for the District. She was aware that the school maintained Stewart's health file. The file contained information that Stewart had asthma and used an albuterol inhaler. That information should have been circulated quarterly to each of Stewart's teachers. The school had a policy that, if a student suffered a "serious" health episode, the teacher should call the nurse; if a student suffered a life-and-death episode, the teacher should call 911 or direct another person to call 911.

Under the title "Student Accident or Illness," the school's policy handbook stated:

> "If any of your students become ill or are injured, you should immediately take or send him to the school health office. *** In the event of a serious accident or illness, you should not attempt to move the student. In such instances, the main office would be notified immediately. We will then call the nurse and the home immediately and will, if necessary, make arrangements for your class to be held elsewhere. An accident report should be filled out within 24 hours for all injuries involving school or classroom activity."

Under the title "Medical Emergency," the school's policy handbook stated:

> "Under life and death circumstances call or have someone call 911 immediately. Be prepared to provide the school name and address, exact location (floor, room, number), describe the illness or type of injury, and the age of the victim(s). *** Administer appropriate first aid according to your level of training until help arrives. Comfort and reassure the victim ***."[1]

On the day in question, two students came into the front part of the office and told nurse Sandra Banbury that a student in Harper's classroom had fallen out of his chair. Weber was not in that part of the office when the students came, and another staff member told her that Banbury had left with the students. Weber decided to sit by the phone and wait for more information. At that point, she knew only that a student had fallen out of his chair.

---

[1]Weber did not read the policy handbook word-for-word, but the handbook is part of the record.

Approximately five minutes later, Harper called her. Harper told her that Banbury had instructed a call to 911. Harper asked Weber to call 911:

> "Q. When you received that phone call, the person that you found out eventually was Mr. Harper told you that Nurse Banbury *told him* to call 911, correct?
>
> A. Correct.
>
> Q. And he was asking you to go ahead and make that 911 call?
>
> A. Correct.
>
> Q. He never indicated to you that he had called 911?
>
> A. No." (Emphasis added.)

¶ 16    Harper did not identify himself as a teacher. Weber thought that Harper was a student; he sounded very young. Because Weber thought that Harper was a student, she did not "pump him with a lot of questions." Weber did ask for Stewart's name. The call ended, and Weber quickly thought to call back for more information. The phone rang several times, but no one answered.

¶ 17    Weber then called 911. It took her several tries to reach 911, because the school had recently changed its dial-out procedures. However, she reached 911 "within seconds." While she was speaking with the 911 operator, her assistant pulled Stewart's health file and copied it. This was done simultaneously with the phone call and did not take additional time.

¶ 18    Although Weber generally knew how to get to Harper's classroom, by this time realizing that Harper was a teacher, she did not feel confident to direct the paramedics there. Therefore, she directed the paramedics to go to the front entrance, where they would be escorted to the classroom. After ending her call with 911, she called the main office and alerted them that the paramedics would be arriving at the front entrance and that school officials should escort them to Harper's classroom.

¶ 19    Weber then ran to Harper's classroom. It took her one minute; she stopped once along the way to confirm that she was going in the right direction. She brought the copy of Stewart's health file to give to the paramedics. When she arrived in the classroom, she saw Banbury performing CPR. She relieved Banbury and continued the CPR.

¶ 20    By Weber's testimony, eight minutes passed from when the students first alerted Banbury to when Weber joined Banbury in performing CPR. Five minutes passed between the first alert and Harper's phone call, two minutes passed between Harper's phone call and Weber's call to the main office, and Weber spent an additional minute running to Harper's classroom.

¶ 21        3. Harper, Pellegrine, Gates, Moser, and Wojtyszyn on the Incident

¶ 22    Harper had been teaching at the school for five years, and Stewart was in his English class. Harper did not know at the time that Stewart had asthma. Harper agreed that, per school policy, he should have been notified that Stewart had asthma.

¶ 23    When Stewart collapsed, Harper was the only teacher in the room. He worked with Wojtyszyn, his coteacher, but she was not in the room at the time. (A coteacher is lower in the school hierarchy than a teacher.) Harper began the class with 15 minutes of silent reading, to be followed by 5 minutes of journaling. Harper made a practice of checking on each student once every 5 minutes, although he had no specific recollection of doing so that day. Initially, Harper did not notice anything wrong; Stewart was not breathing heavily or complaining of pain. Stewart did not tell Harper that he felt unwell, nor did he ask to go to the nurse. Then, about 15 minutes into class, Stewart stood up from his desk, inhaled heavily, "went a little bit forward,"

- 4 -

and fell down. Harper ran over to him. Stewart was "shaking convulsively" on the floor, but he was still breathing. Harper thought that Stewart was having a seizure. Harper asked Stewart if he was "with [him]" and if he could hear him. Stewart seemed "alert" and gave "some indication" to that question, but Harper "couldn't tell really."

¶ 24 Harper told two students, Chase Schwertfeger and Alan Duangdara, to go get the nurse. He did not give the students any specific directions with regard to obtaining the nurse:

> "Q. And you don't recall giving *** any specific instructions besides going to the nurse, do you?
>
> A. Not specifically.
>
> Q. You didn't specifically tell them to run?
>
> A. I don't recall the exact word run, but—
>
> Q. And at this point when you are sending the students to the nurse, [Stewart's] body is shaking, right?
>
> A. Right."

¶ 25 Harper did not call the nurse on the phone, even though he knew that there was a phone in the classroom. He knew that the nurse's office was on the other side of the school (and on a different floor), but he still thought that the students could reach the nurse faster on foot than he could reach the nurse by phone. "Sometimes it's hard to reach the nurse through the phone."

¶ 26 After the students left to get the nurse, Harper turned Stewart on his side. Again, Harper thought that Stewart was having a seizure, and Harper thought that turning Stewart on his side would prevent him from choking on his tongue.

¶ 27 About two minutes after Stewart fell, another coteacher, Katherine Wehri, came into the room. Harper asked her to escort the other students out of the room. Harper directed Pellegrine, Stewart's best friend, to stay in the room as a comfort to Stewart.

¶ 28 For the next five minutes, Harper, Stewart, and Pellegrine were alone in the room. Harper kept Stewart on his side and tried to keep him alert until help arrived. Harper made no other treatment attempts, although he was certified in CPR:

> "Q. Did you attempt to perform CPR ever on [Stewart]?
>
> A. I did not.
>
> * * *
>
> Q. During the time that you were waiting for the nurse, did it ever occur to you that [Stewart] was not able to breathe?
>
> A. He was gasping for breath, but totally not breathing, no.
>
> Q. And you never made any attempt to retrieve an inhaler?
>
> A. No.
>
> Q. Because you didn't know he was asthmatic at the time?
>
> A. Not at the time I wasn't aware."

¶ 29 Approximately seven minutes after the collapse, Banbury entered the room. She assessed Stewart to see if Stewart was "still with" them. She began CPR. After she began CPR, she instructed Harper to call the nurse's office *to have them call* 911. Harper followed Banbury's instruction, and he spoke with Weber on the classroom phone. After Harper spoke with Weber, he returned to Stewart's side. Harper held Stewart's hand. Harper also cleared desks out of the way to give Banbury more room.

¶ 30    When asked why he did not call 911 of his own volition at an earlier time, Harper stated: "Well, I didn't know exactly what was wrong with him. I just ran over to try to see and comfort him to the best of my ability. I thought that going to the nurse first would be the—since she's trained, for her to assess ***." Harper did not have a cell phone; cell phones in the classroom were against school policy. Harper also spoke to his perceived role in the classroom:

"Q. Is your role as a teacher strictly educating the students?

A. Yes.

Q. There are no other parts to your job as a teacher *** other than teaching the children?

A. It is not just to educate them academically, probably socially as well, making sure they know how to respect one another, following the character counts traits that we have at school.

Q. In your understanding back in 2008, did you have any responsibility towards any medical conditions a student might have?

A. Yes.

Q. How so?

A. Just making sure that if they need it, they are free at any time to use their—to use whatever device it is. If they have something like an EpiPen they are free to use it or an inhaler or whatever."

When asked how much time elapsed between the collapse and his call to Weber asking her to call 911, Harper answered: "I don't believe it was more than 10 minutes."

¶ 31    Pellegrine testified that he had known Stewart for years, although they had been going to school together only for months. Stewart was his only friend in Harper's class. They had assigned seats, and he sat one or two desks away from Stewart. He did not notice anything unusual about Stewart that day. About 15 minutes into class, he heard Stewart fall. When Stewart fell, Pellegrine saw Harper run to Stewart. Harper did not use the phone. Pellegrine recounted:

"Q. And he sent—immediately sent students down to get the nurse, correct?

A. Well, not immediately. He, you know, checked to make sure, you know, [Stewart] was okay, you know; and he just kept saying stay with me, stay with me, you know. He rolled—you know—he rolled [Stewart] over, you know, made sure he was with us still, you know; and when he wasn't—

Q. Wasn't breathing?

A. He wasn't breathing, I guess, yeah, and he sent some students to go get the nurse."

¶ 32    Pellegrine stayed beside Stewart to comfort him during the incident, but he was "stunned" and did not know what to do. Pellegrine thought that 15 to 20 minutes passed from Stewart's collapse to Banbury's arrival. "After the incident," Pellegrine found an inhaler in Stewart's pocket.

¶ 33    Generally, Pellegrine thought that Harper treated the students with respect and that, on the day of the incident, Harper did "everything he could" for Stewart.

¶ 34    Gates, another student in the class, testified that Stewart was a friendly acquaintance. During silent reading time, he heard Stewart cough, but it was not an unusual cough. Then,

about 10 to 15 minutes into class, he heard a thud. He looked up from his reading and saw that Stewart had fallen to the floor. He thought that Harper did call the nurse on the phone. Certainly, Harper ran to Stewart's side and shouted to two students to go get the nurse.

¶ 35    Moser, a third student in the class, gave deposition testimony. Contrary to the other student witnesses, Moser noticed that Stewart was breathing heavily minutes prior to his collapse.[2]

¶ 36    Wojtyszyn implemented student individualized education plans (IEPs). Stewart's IEP stated that he had asthma. She could not remember whether she knew of Stewart's asthma on the day of the incident. She could not say whether Harper knew of Stewart's asthma on the day of the incident. She had never seen Stewart use an inhaler. The phone in Harper's classroom could be used to call 911.

¶ 37    On the day of the incident, she noticed nothing unusual about Stewart. A few minutes into class, she left to run an errand within the building. On her way back to the classroom, she met Schwertfeger and Duangdara as they were running to get the nurse. She saw another teacher, presumably Wehri, entering Harper's classroom, so she knew that Harper would not be alone. She decided to go with the boys to the nurse. They ran. She saw that the boys made it to the nurse. Then, she decided to run to the special education office, to see if Stewart's file contained any helpful information. The file contained information that Stewart had asthma. She ran back to Harper's classroom with the file. Banbury was already there, performing CPR. Wojtyszyn followed the directions of Banbury and Weber. She ran for items they needed, such as a "bag." Wojtyszyn helped with CPR because Banbury and Weber were getting tired. Then, the paramedics arrived and took over.

¶ 38                          4. Carrerra and Seskind on Cause of Death

¶ 39    Carrerra testified regarding the autopsy report. The report stated the cause of death as "bronchial asthma." The report also disclosed that Stewart weighed 325 pounds and had an enlarged heart and sclerotic thickening of the heart's mitral valve.

¶ 40    Seskind, an internist specializing in heart and lung disease, had been practicing medicine for 55 years, and asthma patients and cardiac patients each accounted for 25% of his practice. In reaching his opinion, Seskind reviewed the death certificate; the autopsy report; depositions from other physicians who read the report; and depositions from Stewart's school nurses, teachers, and classmates.

¶ 41    Seskind opined to a reasonable degree of medical certainty, "I think [Stewart] clearly died of asthma." In support of his opinion, Seskind noted two common signs that a person likely suffered from a fatal asthma attack: excess mucus and inflammation of the breathing tubes. Stewart did not have mucus, but he exhibited inflammation of the breathing tubes. When a person has inflammation of the breathing tubes, he cannot get enough air. There is a lack of oxygen to all organs in the body. The lungs fail first and then the heart and brain.

¶ 42    Seskind ruled out cardiac arrest, because Stewart's coronaries were "totally patent." Stewart had a large heart, but the size of Stewart's heart correlated with the size of his body. The heart chambers and the heart walls were of normal size and thickness. The lungs had some

---

[2]The transcripts from Moser's deposition were read to the jury. However, it is unclear exactly what the jury heard, because the court reporter did not record what was read, and portions of the deposition were stricken.

fluid due to the CPR as the heart failed, but Seskind would have expected much more fluid if Stewart had suffered a cardiac arrest. That a person's heart ultimately fails does not mean that heart failure was the cause of death. In death, each person's heart ultimately fails.

¶ 43 Seskind testified to the importance of prompt treatment. The sooner a person who has difficulty breathing receives relief, the sooner critical organs will receive oxygen. Once a young man of Stewart's age begins to struggle to breathe, he typically has "a minimum of eight minutes, possibly a little longer." In rare cases, a person can be resuscitated after a longer period. The most extraordinary resuscitation Seskind knew of was a drowning victim who was resuscitated after 25 minutes. After being informed that here the paramedics took six minutes to arrive, Seskind opined that, had someone called 911 within the first two minutes of Stewart's collapse, the paramedics more likely than not would have been able to resuscitate Stewart.

¶ 44 During cross-examination, Seskind made several concessions. He knew that a student later reported that Stewart had "trouble" in gym class and had stated that his heart hurt. (No student timely reported this to a teacher.) He knew that Stewart had a body mass index (BMI) of 41. The BMI threshold for "morbidly obese" was 40. Generally, a person with a BMI of 41 is likely to have a heart condition. (However, given the autopsy results, Seskind did not believe that Stewart had a heart condition.) Admittedly, it was rare for a person suffering from a severe asthma attack to stand up suddenly and collapse. And, in his deposition, Seskind had stated that Stewart's heart might have failed at the moment of collapse.

¶ 45 On redirect examination, Seskind clarified his deposition testimony concerning the collapse. Stewart's heart became weak because Stewart was not getting enough oxygen. This caused Stewart to collapse. The initial problem was asthma. Stewart could have been resuscitated following his collapse, as evidenced by his continuing struggle to breathe. When Banbury walked into the room, she heard him struggle to breathe. Banbury had referred to the breathing as "agonal," which typically indicates a terminal breath. However, in Seskind's view, "as long as there were efforts at breathing, I would not describe it as *** a terminal last breath."

¶ 46 Following Seskind's testimony, the District moved for a directed verdict, and the trial court denied it. The District did not then raise the issue of absolute immunity.

¶ 47 B. The District's Case

¶ 48 The District presented the following witnesses: Banbury (through video deposition), Dr. Martin Tobin (medical expert), and Dr. Stephen Hoffman (medical expert).

¶ 49 1. Banbury, on the Incident

¶ 50 Banbury testified that, about one month before the incident, Stewart came to her with difficulty breathing. It was not severe. Banbury called Stewart's mother, who did not answer. Banbury then called Stewart's aunt, who told Banbury that Stewart did not have an inhaler. Contrary to Weber's testimony, Banbury denied having any medical letters in Stewart's file indicating that he needed an inhaler. However, pursuant to a school policy to e-mail the teachers at the start of each semester regarding students' health conditions, Banbury recalled e-mailing Harper to let him know that Stewart had asthma.

¶ 51      On the day in question, two students came into the office and told her that a student in Harper's class had fallen out of his chair. They did not give any other information, such as whether Stewart was unconscious or had difficulty breathing. Banbury instructed one student to bring a wheelchair to Harper's classroom in the event that Stewart had fainted and needed to be taken to the nurse's office. Then, Banbury and the other student ran to the classroom. It took two minutes, three minutes "tops." Contrary to Weber's testimony that Weber heard about the emergency secondhand before waiting by the phone, and contrary to Banbury's own earlier testimony that the students did not tell her that Stewart had difficulty breathing, Banbury testified that Weber called out to her before she left, saying that she would follow behind with an "ambu bag." The ambu bag is similar to a large syringe, and it helps to provide air to someone who is not breathing.

¶ 52      When Banbury entered the classroom, she saw Stewart on the floor. She kneeled down beside him and saw that he exhibited agonal breathing. Agonal breathing has a very distinct sound, as though no air is being exchanged. It is a "classic sign" of cardiac arrest. She saw Stewart's eyes roll back. She checked for a pulse, and there was none. She told Harper to call 911 and to call for a defibrillator.

¶ 53      Banbury did not hear whether Harper called 911 first or called for a defibrillator first, because she turned her focus to providing CPR. She had started CPR within seconds of entering the room.

¶ 54      Stewart vomited during CPR. The agonal breathing stopped. The first round of CPR took one minute. During the second round of CPR, Weber came to the room. Weber relieved Banbury and continued the CPR. Banbury gave "breaths" to Stewart. Then, a female teacher came into the room to help with the CPR. Shortly thereafter, the paramedics arrived and took over the CPR.

¶ 55                                       2. Tobin and Hoffman, on Cause of Death

¶ 56      Tobin, an internist certified in pulmonary and critical care, had been practicing for 40 years and had treated thousands of patients with asthma and many patients with severe asthma. In reaching his opinion in this case, Tobin reviewed the emergency room records; Stewart's past medical records; the autopsy report; and the deposition testimony of Mary, Stewart's medical providers, and his teachers.

¶ 57      Tobin opined to a reasonable degree of medical certainty that Stewart died of heart failure. In support of his opinion, Tobin noted that Stewart's sudden collapse was consistent with a cardiac arrest. Additionally, the fluid in Stewart's lungs was consistent with succumbing to heart failure. This is known as "foaming" or alveolar edema, which was mentioned in the autopsy report. Additionally, Stewart had told classmates that he experienced chest pain. This was included in the emergency room report. Typically, a person suffering from asthma would report chest tightness, not chest pain.

¶ 58      Tobin believed that Stewart had the chronic condition of asthma but that asthma did not cause Stewart's death. When a person dies from an asthma attack, he typically has labored breathing for *hours* prior to death. Additionally, unlike Stewart, persons who die from asthma attacks usually have increasingly severe attacks in the days prior to death. Here, Stewart sat in a quiet room, and no one heard anything unusual until he collapsed.[3] Further, Stewart, who

---

[3]We note, again, that Moser testified that he heard Stewart have trouble breathing.

had suffered from asthma attacks in the past, never reached for his inhaler, even though it was in his pocket. Stewart did not make gestures commonly made by people who cannot breathe, such as grabbing the throat. Finally, Stewart's smooth muscle as described in the autopsy report did not show the level of enlargement or "mucus impaction" that would be expected in a person who had died of an asthma attack.

¶ 59    Huffman, an emergency room physician, treated asthma on a near daily basis. Huffman reviewed the medical records and depositions. Huffman was not sure whether Stewart died of a heart event or a lung event (asthma). However, to a reasonable degree of medical certainty, Huffman opined that Stewart died within *seconds* of his collapse. He believed that the District did "everything reasonably responsible [*sic*]." Dialing 911 immediately would not have led to a different result.

¶ 60    On cross-examination, Huffman acknowledged that, according to Banbury, Stewart was still breathing when she walked into the room *minutes* after the collapse.

¶ 61            C. Jury Instructions, Verdict, and Motion for Judgment *N.O.V.*

¶ 62    The parties discussed the jury instructions. The court would give a standard jury instruction defining willful and wanton conduct consistent with the statutory definition. The court would also instruct that the jury could find that the District acted willfully and wantonly if the District "prevent[ed] [Stewart] from obtaining prompt and appropriate medical care" or "fail[ed] to provide immediate medical care" in a manner that fit the willful-and-wanton definition. (The Estate had initially proposed eight different descriptors of the alleged willful and wanton conduct, such as failing to call 911. However, after listening to the District's objection that the Estate provided a "laundry list," the court narrowed the list to the two descriptors quoted above, concerning access to medical care).

¶ 63    The jury found in favor of the Estate. It returned a $2.5 million verdict.

¶ 64    The District moved for judgment *n.o.v.* and, alternatively, a new trial. The trial court denied the motions. As to the motion for judgment *n.o.v.*, the court stated: "This is a very high standard which this court finds the defendant has failed to meet." As to the motion for a new trial, alleging insufficiency of the evidence, the court stated:

> "Like the jury, the trial court had the opportunity to observe the witnesses, their demeanor while testifying, and the circumstances in aiding in the determination of their credibility. The court finds that reasonable minds could differ when evaluating the evidence. I will not substitute my judgment merely because the trial court might have resolved the case in a different way."

The District did not then raise the issue of absolute immunity. This appeal followed.

¶ 65                                    II. ANALYSIS

¶ 66    The District argues that the trial court erred in (1) denying its motion for a new trial based on insufficient evidence of willful and wanton conduct (and denying its motions for a directed verdict and judgment *n.o.v.* on the same basis); (2) issuing a jury instruction that used the word "prevent," where there was no evidence that Harper prevented medical care; and, earlier, (3) denying summary judgment based on section 2-201 absolute immunity for policy

determinations made with discretion. We reject each of the District's arguments.[4]

¶ 67                        A. Sufficient Evidence of Willful and Wanton Conduct

¶ 68     The District argues that the trial court erred in denying its motion for a new trial based on insufficient evidence of willful and wanton conduct (and denying its motions for a directed verdict and judgment *n.o.v.* on the same basis). With respect to the District's sufficiency arguments, we address only whether the trial court erred in denying the motion for a new trial. That motion carried the lowest standard for reversal, and as the District failed to meet that standard, there is no need to address the other motions.

¶ 69                                    1. Standard of Review

¶ 70     When considering whether to grant a new trial, the trial court must consider whether the jury's verdict was against the manifest weight of the evidence. *Maple v. Gustafson*, 151 Ill. 2d 445, 454 (1992). A verdict is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the jury's finding is unreasonable, arbitrary, and not based on any of the evidence. *Id.* Here, in denying the motion for a new trial, the trial court stated:

> "The court finds that reasonable minds could differ when evaluating the evidence. I will not substitute my judgment merely because the trial court might have resolved the case in a different way."

In ruling upon the motion for a new trial, the trial court had the benefit of its previous observation of the witnesses' appearance and manner in testifying and of the circumstances aiding in the determination of their credibility. *Id.* at 456. Thus, we will not reverse the trial court's ruling on a motion for a new trial unless it abused its discretion. *Id.* at 455. In deciding whether the court abused its discretion in denying a new trial, we should consider whether the losing party was denied a fair trial and whether there was evidence to support the verdict. *Id.* As we determine that there was evidence to support the verdict, we affirm the trial court.

¶ 71                                2. The Willful-and-Wanton Standard

¶ 72     There is no separate, independent tort of willful and wanton conduct; rather, willful and wanton conduct is regarded as an aggravated form of negligence. *Doe-3 v. McLean County Unit District No. 5 Board of Directors*, 2012 IL 112479, ¶ 19. To prevail on an allegation of willful and wanton conduct, "a plaintiff must plead and prove the basic elements of a negligence claim—that the defendant owed a duty to the plaintiff, that the defendant breached that duty, and that the breach was a proximate cause of the plaintiff's injury." *Id.* A plaintiff also must allege either "a deliberate intention to harm or an utter indifference to[,] or a conscious disregard for[,] the welfare of the plaintiff." *Doe v. Chicago Board of Education*, 213 Ill. 2d 19, 28 (2007).

¶ 73     The District enjoys limited immunity in tort pursuant to section 3-108(a) of the Act and section 24-24 of the School Code (Code). 745 ILCS 10/3-108(a) (West 2008); 105 ILCS

---

[4]At oral argument, the District focused entirely on the first two arguments. Also at oral argument, the District stated that it sought a judgment *n.o.v.*, not a new trial. In context, we view its statement as simply favoring a judgment *n.o.v.*, not as waiving its argument for a new trial.

5/24-24 (West 2008). Each of those sections provides immunity against negligent conduct but not against willful and wanton conduct. Section 3-108(a) of the Act states:

> "Except as otherwise provided in this Act, neither a local public entity nor a public employee who undertakes to supervise an activity on or the use of any public property is liable for an injury unless the public entity or public employee is guilty of willful and wanton conduct in its supervision proximately causing such injury." 745 ILCS 10/3-108(a) (West 2008).

Section 24-24 of the Code states:

> "In all matters relating to the discipline in and conduct of the schools and the school children, [school employees providing services for the children] stand in the relation of parents and guardians to the pupils." 105 ILCS 5/24-24 (West 2008).

Because a parent can be liable in tort only for willful and wanton conduct, a teacher can be liable in tort only for willful and wanton conduct. *Courson v. Danville School District No. 118*, 301 Ill. App. 3d 752, 755 (1998).

¶ 74    By providing limited immunity, the legislature sought to shield public officials from having to answer in damages for decisions that, in hindsight, turn out to be wrong. *Harris v. Thompson*, 2012 IL 112525, ¶ 45. It also sought to prevent the diversion of public funds from their intended purpose to pay damages. *Henrich v. Libertyville High School*, 186 Ill. 2d 381, 393 (1998).

¶ 75    "Willful and wanton conduct" means a course of action that shows an actual or deliberate intention to cause harm or that, if not intentional, shows an utter indifference to, or conscious disregard for, the safety of others or their property. 745 ILCS 10/1-210 (West 2008). Utter indifference to, or conscious disregard for, the safety of others consists of more than mere inadvertence, incompetence, or unskillfulness. *Geimer v. Chicago Park District*, 272 Ill. App. 3d 629, 637 (1995). As is at issue in this case, an omission or failure to act against a known danger may substantiate a claim of utter indifference or conscious disregard. See *Doe*, 213 Ill. 2d at 28 (the failure to take action to protect other students against a harmful student could constitute willful and wanton conduct). One must consider the totality of the circumstances in deciding whether a defendant acted with utter indifference or conscious disregard. *Harris*, 2012 IL 112525, ¶ 45.

¶ 76    The District asserts that this court may consider only the statutory definition of willful and wanton conduct and that any common-law "definitions" of willful and wanton conduct are inapplicable. While we agree with the District that the statutory definition applies to every willful-and-wanton case, we do not agree that the statutory definition renders irrelevant prior common-law analyses of willful and wanton conduct, so long as the analyses are consistent with the statutory definition. Because the District's argument concerns the very definition of willful and wanton conduct, we further address its position.

¶ 77    The District first points to the statutory definition of willful and wanton conduct. As we have stated, the statutory definition is "a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property." 745 ILCS 10/1-210 (West 2008). In 1998, without changing any language in the statutory definition, the legislature added the following sentence to section 1-210: "This definition shall apply in any case where a 'willful and wanton' exception is incorporated into any immunity under this Act." Pub. Act 90-805, § 5 (eff. Dec. 2,

- 12 -

1998) (amending 745 ILCS 10/1-210). The 1998 amendment did not change the statutory definition of willful and wanton conduct; it simply mandated its application to all allegations of willful and wanton conduct brought under the Act.

¶ 78    In *Murray v. Chicago Youth Center*, 224 Ill. 2d 213, 242-43 (2007), the defendants argued that the 1998 amendment reflected an intent to replace the common-law definition of willful and wanton with the statutory definition. In their view, the statutory definition reflected a "heightened" definition of willful and wanton as compared to some of the existing common-law definitions and applications. *Id.* at 242. The *Murray* court declined to consider the effect of the 1998 amendment because, in *Murray*, a pre-1998 version of the Act controlled. *Id.* at 242-43. The court stated, however, that the pre-1998 statutory definition, which lacked only the language mandating its universal application, was "entirely consistent" with existing common-law precedent concerning willful and wanton conduct. *Id.* at 235.

¶ 79    After *Murray*, appellate courts considered whether the 1998 amendment reflected an intent to replace the common-law definition of willful and wanton with the statutory definition. See *Thurman v. Champaign Park District*, 2011 IL App (4th) 101024, ¶ 13 (the statutory definition applies to the exclusion of *inconsistent* common-law definitions); *cf. Tagliere v. Western Springs Park District*, 408 Ill. App. 3d 235, 244-45 (1st Dist. 2011) (the statutory definition applies to the exclusion of *any* common-law definitions, even those that are not necessarily inconsistent). In *Tagliere*, the court noted that, in discussing the amendment, a legislator stated: "A sentence has been added to the definition of willful and wanton conduct in the Act, clarifying that the statutory definition be used for cases affected by the Act and that *other* definitions of willful and wanton conduct that may have or will be provided through common laws, shall not be used in such cases." (Emphasis added and internal quotation marks omitted.) *Tagliere*, 408 Ill. App. 3d at 243. After *Thurman* and *Tagliere*, albeit without discussion, the supreme court again stated that the statutory definition is "entirely consistent" with the common law. *Harris*, 2012 IL 112525, ¶ 41.

¶ 80    Particularly in light of the *Harris* court's continued approval of common-law precedent, we prefer the approach in *Thurman* over the approach in *Tagliere*. That is, to the extent that common-law precedent is consistent with the statutory definition, it remains instructive. We read the legislator's reference to "other" common-law definitions to mean "inconsistent" common-law definitions, as opposed to "all" common-law definitions. As we will explain in greater detail (*infra* ¶¶ 109-14), perhaps the confusion results from using the word "definition" interchangeably with the word precedent, guideline, application, or analysis. There is only one definition. It is the statutory definition. The statutory definition applies to all willful-and-wanton cases brought under the Act. 745 ILCS 10/1-210 (West 2008). However, where pre-1998 courts applied the now-mandated statutory definition and, in so doing, created precedential analyses, their rulings remain good law and their analyses may continue to provide guidance. See *Harris*, 2012 IL 112525, ¶ 41.

¶ 81                              3. The District's Argument

¶ 82    The District argues that Harper's actions immediately following Stewart's collapse, wherein Harper sent two students on foot to get the nurse and turned Stewart on his side to prevent choking, preclude a willful-and-wanton determination. The District contends that, although these actions might have been misguided, they demonstrate care rather than "utter indifference" and, therefore, as a matter of law, cannot be considered willful and wanton. The

District cites three cases in support of its position: *Bielema v. River Bend Community School District No. 2*, 2013 IL App (3d) 120808, ¶ 19 (the educator did not display willful and wanton conduct where she failed to more effectively mark spilled Gatorade on a gym floor to keep a high school student from slipping; rather, she "took action" by telling another adult to stand by the spill while she went to retrieve cleaning materials); *Mitchell v. Special Education Joint Agreement School District No. 208*, 386 Ill. App. 3d 106 (2008) (the educator did not display willful and wanton conduct where she stepped away from a special-needs student who choked on a cupcake; rather, she evinced care by not stepping away until she believed that all of the students were finished with their cupcakes, even walking backward to maintain supervision); and *Stiff v. Eastern Illinois Area of Special Education*, 279 Ill. App. 3d 1076 (1996) (the educators did not display willful and wanton conduct by "abandoning" a seven-year-old, special-needs student who broke her leg when she fell from a bridge five feet off of the ground during a field trip to a state park; rather, they evinced care by keeping two educators within inches of her as she crossed the bridge).

¶ 83        In response, the Estate urges that, rather than emphasizing Harper's initial actions, the jury was free to place more weight on Harper's unjustifiable 7- to 20-minute delay in calling or having someone call 911. The Estate also cites three cases in support of its position: *American National Bank & Trust Co. v. City of Chicago*, 192 Ill. 2d 274 (2000) (the complaint supported the allegation of willful and wanton conduct where the 911 operator did not stay on the line with the caller and where, contrary to the paramedics' policy handbook, the paramedics, believing they had the wrong address, left the scene without attempting to enter the apartment by turning the door handle; the door had been unlocked and the caller was later found dead); *Abruzzo v. City of Park Ridge*, 2013 IL App (1st) 122360 (the evidence supported the jury's willful-and-wanton finding, where the paramedics failed to follow their standard operating procedure, by not taking the 15-year-old boy's vital signs, and their training, by not inquiring further about the boy's admission that he had taken pills that made him sleepy, *despite* the father's alleged statement to the paramedics that it had been a false alarm and *despite* the expert's admission that it could not be determined whether the boy took additional pills to cause his death *after* the paramedics left); and *Kirwan v. Lincolnshire-Riverwoods Fire Protection District*, 349 Ill. App. 3d 150 (2004) (the complaint supported the allegation of willful and wanton conduct where, contrary to standard operating procedure, the paramedics failed to immediately administer epinephrine and related drugs to prevent death from a known, severe nut allergy and, instead, wasted six minutes performing nonessential tasks).

¶ 84        The cases cited by the parties highlight three factors upon which the jury here may reasonably have relied in reaching its willful-and-wanton finding. Specifically, in addressing the question of willful and wanton conduct, factors courts have considered include whether there was (1) a deviation from standard operating procedures or a policy violation (see, *e.g.*, *American*, 192 Ill. 2d at 286); (2) an unjustifiably lengthy response time (see, *e.g.*, *Kirwan*, 349 Ill. App. 3d at 157); or (3) an unjustifiably inadequate response to a known danger (see, *e.g.*, *Bielema*, 2013 IL App (3d) 120808, ¶ 19). These factors do not represent requirements for finding willful and wanton conduct, which must be based on the totality of the circumstances. A consideration of these factors simply highlights the evidence supporting the jury's verdict in this case.

¶ 85                    i. Standard Operating Procedure Deviation or Policy Violation

¶ 86        The first factor, whether there was a deviation from standard operating procedures or a violation of policy, highlights a clear difference between the cases cited by the District and the cases cited by the Estate. *None* of the cases cited by the District involved a clear violation of a fundamental policy. In *Bielema*, the principal noticed spilled Gatorade and directed her husband to stand beside the spill while she retrieved cleaning materials. *Bielema*, 2013 IL App (3d) 120808, ¶ 5. There was no school policy that she do more in response to a simple spill. In *Mitchell*, the aide followed the school's student-specific, informal policy of cutting the student's cupcake into small pieces and sitting beside him as he ate. *Mitchell*, 386 Ill. App. 3d at 109. She did not leave the student's side until she thought that all of the students had finished their cupcakes. *Id.* Thus, she did not violate any school policy. Finally, in *Stiff*, the mother participated in planning the student's extracurricular education and, we assume, gave permission for the girl to go on the field trip to the state park. *Stiff*, 279 Ill. App. 3d at 1079. The teachers and the student encountered an obstacle common to the experience of hiking in a state park. *Id.* There was no school policy against cautiously proceeding in an effort to complete the experience.

¶ 87        In contrast, *each* of the cases cited by the Estate involved a clear violation of standard operating procedures or policy. In *American*, the policy manual stated that, when no resident answers the door, a paramedic should try, at a minimum, turning the knob on the door. *American*, 192 Ill. 2d at 286. Instead, the paramedics violated the express policy by exiting the scene without making any attempt to enter the residence. *Id.* In *Abruzzo*, the paramedics violated the minimum standard operating procedure of conducting a basic assessment, such as a pulse reading, for each subject of a 911 call. *Abruzzo*, 2013 IL App (1st) 122360, ¶¶ 9, 81. Additionally, the paramedics violated their training by failing to inquire further in response to the child's admission that he had taken pills that made him sleepy. *Id.* ¶¶ 77-81. Finally, in *Kirwan*, the paramedics violated their standard operating procedure and training by failing to administer within one minute the appropriate drugs to a person suffering a severe nut allergy. *Kirwan*, 349 Ill. App. 3d at 157.

¶ 88        Here, as in *American*, *Abruzzo*, and *Kirwan*, Harper violated a clear policy. The school policy handbook directly addressed medical emergencies. Under the title, "Medical Emergency," the school policy handbook stated:

> "Under life and death circumstances call or have someone call 911 immediately. Be prepared to provide the school name and address, exact location (floor, room, number), describe the illness or type of injury, and the age of the victim(s). *** Administer appropriate first aid according to your level of training until help arrives. Comfort and reassure the victim ***."

Harper did not call or have someone else call 911 immediately upon Stewart's collapse. Instead, only after 7 to 20 minutes, when Banbury directed him to, he asked Weber to call 911. Also contrary to policy, he failed to provide Weber with the exact location of the room, and, according to Weber, he did not provide sufficient detail concerning Stewart's condition.

¶ 89        Additionally, the evidence supported a finding of an earlier policy violation or, at least, a deviation from standard operating procedure in managing and dispersing student healthcare information. Mary and Robb testified that they informed the school that Stewart had asthma. Wojtyszyn testified that Stewart's IEP stated that he had asthma, and Weber testified that Stewart's health file contained information that he had asthma and carried an albuterol inhaler

with him in school. Banbury testified that she recalled e-mailing Harper to inform him that Stewart had asthma. Harper agreed that it was "school policy" to keep teachers informed of students' known health conditions, but he averred that he never received that information and did not know that Stewart suffered from asthma. Whether the jury believed that Banbury failed to send the e-mail or that Harper ignored it, the jury could have reasonably concluded that at least one of the District's agents deviated from protocol in handling Stewart's healthcare information.

¶ 90    The District argues that Harper did not violate the medical-emergency policy because Harper did not realize that he faced a "medical emergency" or a "life-or-death situation." Instead, Harper thought that he faced a "serious" situation, for which school policy directed that a nurse be summoned via notification of the main office.[5] The jury likely found this assertion incredible. Most reasonable people would view a young person's thud-like collapse and struggle for breath and consciousness as a medical emergency. Moreover, Harper's own testimony belied his position. For example, Harper stated that he ran to Stewart. He repeatedly asked Stewart to "stay with him," which could be considered an acknowledgment that he knew that Stewart was fighting for his life. Additionally, he implied that he did not need to expressly direct the students to "run" to the nurse because the urgency of the situation should have been obvious to them. If Harper thought that high school students should understand the urgency of the situation, it is difficult to understand how he can say that he himself did not understand the urgency of the situation. Thus, we reject the District's argument that Harper did not violate the school policy pertaining to medical emergencies.

¶ 91                                      ii. Response Time

¶ 92    The second factor, whether there was an unjustifiably lengthy response time, also underscores a clear difference between the cases cited by the District and the cases cited by the Estate. In each of the cases cited by the District, the educator had *only seconds* to react to a child's physical movement. In *Bielema*, the principal was gone for a moment to retrieve cleaning materials when a student slipped. In *Mitchell*, the student ingested a cupcake before his aide, mere feet away, could stop him. Finally, in *Stiff*, the student slipped off of a bridge before teachers, just inches away, could grab her. We recognize that, primarily, the alleged willful and wanton conduct in those cases concerned the initial risk exposure. Still, response time was a factor. While an omission or failure to act can constitute willful and wanton conduct, it would require truly extreme circumstances to characterize such a failing as willful and wanton where the window of opportunity for action closed within seconds.

¶ 93    In contrast, each of the cases cited by the Estate involved circumstances where the alleged wrongdoer had substantially more time to react to the danger posed to the person to whom he owed a duty. In *American*, there was no time constraint on the paramedics' ability to open the resident's door. The paramedics simply never made an attempt to open the door. In *Abruzzo*, the child was awake and speaking when the paramedics arrived. The paramedics surely could have taken minutes, or longer, to evaluate his condition. There was no time constraint on their ability to perform the evaluation; they simply chose to leave without performing the evaluation. Finally, in *Kirwan*, the paramedics were trained to administer the appropriate drugs within one minute. *Kirwan*, 349 Ill. App. 3d at 153. Instead, they did not administer the drugs

---

[5]We note that, although Harper did arrange to summon the nurse, he did not notify the main office.

until after the person suffering the allergic reaction went into shock, six minutes later. *Id.* at 156-57. The *Kirwan* court stated: "In cases of life-threatening emergencies, seven or eight minutes can be a significant delay that could amount to 'utter indifference' or 'conscious disregard' for [the] decedent's safety." *Id.* at 157.

¶ 94        Here, unlike in *Stiff*, *Mitchell*, and *Bielema*, Harper had more than mere seconds to respond to the danger posed to his charge. Similar to the 6- to 8-minute delay in *Kirwan*, Harper's delay lasted 7 to 20 minutes. Given the lengthy time frame at issue, the jury may have rejected the District's attempts to characterize Harper's failure to call or have someone call 911 as "an error of judgment in the pressure of the moment" or a "split-second decision." Instead, the jury may have reasonably found unjustifiable Harper's 7- to 20-minute continuing failure to act.

¶ 95        The District attempts to shorten the 7- to 20-minute window to 2 minutes. It urges, as one of its main premises, that only the first two minutes of Harper's conduct are relevant. It points to Seskind's testimony that asthma victims can typically be resuscitated within eight minutes. It is documented that, after 911 was called, it took six minutes for the paramedics to arrive. Therefore, according to the District, as eight minus six is two, only the first two minutes of Harper's conduct could have had any effect on the outcome.

¶ 96        The District's argument speaks to the causation element of the Estate's claim. However, as we will explain, Harper's later conduct, even after it was "too late" to save Stewart, may still be relevant to the willful-and-wanton element of the claim. Regardless, as to either element, the jury was not required to accept the two-minute period.

¶ 97        As to the willful-and-wanton element, the jury need not have limited its review of Harper's conduct to the critical period wherein Harper's conduct could have influenced the outcome. It would be absurd to suggest that Harper did not bother to call 911 after the first two minutes because *he* knew at that point that the paramedics would not arrive in time. The District would be hard-pressed to argue that Harper did not call 911 within the first 2 minutes simply because he did not have time, where Harper *also* failed to call 911 during the next 5 to 18 minutes. A juror could draw inferences from Harper's subsequent behavior to interpret his earlier behavior. Thus, Harper's continuing inaction after the critical period concluded *was* relevant, because it gave color to his earlier conduct.

¶ 98        Even as to causation, the jury was not required to limit its review to the first two minutes following the collapse. The jury could consider precollapse conduct, and as to postcollapse conduct, the jury was not required to accept the eight-minute resuscitation period or the six-minute travel period.

¶ 99        The jury could consider precollapse conduct. While the Estate focused on Harper's conduct, the District is the defendant. The jury heard evidence concerning Harper's training and notification. Whether Banbury, another District agent, properly notified Harper of Stewart's condition as required and whether Harper ignored an important e-mail were questions of fact for the jury. Either way, the alleged training and notification errors were part of the totality of the circumstances that arguably contributed to the outcome, and these errors occurred precollapse.

¶ 100       Turning to postcollapse conduct, the jury was not required to accept the eight-minute resuscitation period as critical to Stewart's survival. Admittedly, Seskind stated that the eight-minute resuscitation period begins when an asthma victim first "struggles for breath." And most witnesses agreed that Stewart's first struggle for breath occurred nearly simultaneously with his collapse. However, Seskind did not set forth a hard-and-fast

- 17 -

resuscitation period, acknowledging that, in rare instances, a person can be resuscitated upwards of 20 minutes after breathing has ceased altogether. Moreover, Seskind was not the only asthma expert. Tobin stated that, in his experience, an asthma victim might struggle to breathe for *hours* before death. Thus, when considering the eight-minute resuscitation period, the jury may have distinguished between a patient who is struggling for breath and a patient who has ceased breathing altogether. Here, all witnesses agreed that Stewart was *still breathing* 7 to 20 minutes after the collapse (although he lost his pulse shortly thereafter) when Banbury entered the room and began CPR. Based on this evidence and reasonable inferences drawn from it, the jury may have believed that Stewart's life could have been saved more than eight minutes after the collapse.

¶ 101    Additionally, the jury need not have accepted the six-minute paramedics' travel period as the minimum time before Stewart could have received medical attention. Contrary to school policy, the paramedics were not informed of Stewart's location within the school, including the closest door. Instead, Weber told the paramedics to use the front entrance. Separately, before Stewart lost his pulse, 7 to 20 minutes after the collapse, Stewart likely would have benefitted from his inhaler. Had Harper followed the policy and sought the experience of a 911 operator, the operator might have run through a basic medical-history checklist. The operator might have prompted Harper or Pellegrine to remember that Stewart had asthma. We understand that Harper is not a medical expert, and that is why Harper's individual failure to consider and treat asthma did not by itself constitute willful and wanton conduct. Still, it is exactly because Harper is not a medical expert that he should have called 911 immediately. A trained professional with a clear head could have redirected Harper's actions. Harper needed to perform the first, simple, obvious step in the policy: call 911 immediately. The jury could have found that, had Harper done so, it is likely that Stewart immediately would have received some, albeit unskilled, medical attention.

¶ 102                              iii. Inadequate Response to a Known Danger

¶ 103    Finally, we turn to the third factor, whether Harper's response to a known danger was unjustifiably inadequate. The failure to adequately respond to a known danger may constitute utter indifference or conscious disregard. See, *e.g.*, *Doe*, 213 Ill. 2d at 28 (failure to adequately protect a special-needs student from a student known to have dangerous propensities could constitute utter indifference or conscious disregard).

¶ 104    The District urges that it cannot have acted willfully and wantonly in responding to a known danger so long as it "took action" in response to it. The District points to language in *Bielema*, where the court stated that the principal cannot have acted willfully and wantonly where, to remedy the danger posed to the student, she "took action" by ordering an adult to stand by the spill and by retrieving cleaning materials. *Bielema*, 2013 IL App (3d) 120808, ¶ 19. The District also notes that the educators in *Mitchell* and *Stiff* took action to guard against danger, by cutting the cupcake and staying close to the student crossing the bridge, and that these actions were sufficient to insulate them from allegations of willful and wanton conduct.

¶ 105    We disagree with the District's implication that taking *any* action in response to a known danger is sufficient to insulate a defendant from allegations of willful and wanton conduct. In *Burlingame v. Chicago Park District*, 293 Ill. App. 3d 931, 934 (1997), the court explained what *sort* of action, made in response to a potential or a known danger, could constitute willful and wanton conduct:

"We find that this approach can provide useful guidance for charges of willful and wanton misconduct: a failure to repair a dangerous condition may constitute negligence whenever the likelihood of severe injury outweighs the burden of preventing injury, but the same failure constitutes willful and wanton conduct only if the balance is especially one-sided, as where the likelihood of severe injury is particularly great or the burden of preventing it is patently small. Only in cases of such severe imbalances could the failure to act shock the conscience in the manner of willful and wanton misconduct."

As such, the *Burlingame* proposition instructs that we must evaluate both the nature of the danger and the nature of the action taken in response, rather than merely allow any action taken in response to any danger to insulate a defendant from allegations of willful and wanton conduct.

¶ 106    In the cases cited by the District, the educators took reasonable actions to guard against relatively commonplace dangers—wiping a spill to guard against slipping, cutting a cupcake to guard against choking, and staying close to a student crossing a bridge to guard against falling five feet. In contrast, in the cases cited by the Estate, the defendants took some action, but they also failed to take certain obvious actions in response to life-threatening dangers—turning the knob on a door, checking vitals, or administering epinephrine. Here, the inadequacy of Harper's response to Stewart's collapse is similar to the defendants' failings in the cases cited by the Estate.

¶ 107    The District argues that, as a matter of law, Harper should be insulated from allegations of willful and wanton conduct because he "took action." The District focuses on Harper's initial response. He sent two students to the nurse by foot, ran to Stewart, turned Stewart on his side to guard against choking, moved chairs out of the way, ordered Pellegrine to stay, and ordered the other students to leave.

¶ 108    We agree that these actions, even if misguided, do not constitute willful and wanton conduct. Harper is not a medical professional. However, we disagree that taking these actions insulates Harper from allegations of willful and wanton conduct. These actions cannot have taken more than a minute or two. These actions and calling 911, or calling the nurse's office by phone, are not mutually exclusive. After taking these actions, Harper remained beside Stewart for an additional 6 to 19 minutes, during which he had a continuing duty to act. It is difficult to understand why, after summoning the nurse, Harper did not also call 911 or try to reach the nurse by phone. The nurse's office was on the other side of the high school, and Harper must have known that, without calling 911 or the nurse, it would be minutes before a medical professional could provide instruction or aid. By Harper's own testimony, he waited 7 to 10 minutes before asking Weber to call 911. He did this only after Banbury told him to call 911, and he never called 911 of his own volition, even while Stewart lay on the floor fighting for breath. From this, the jury could have inferred that Harper never would have called 911, or directed someone else to call 911, in response to a life-threatening emergency. This case is not about Harper's initial action; it is about his subsequent inaction. The jury could have reasonably found that Harper's subsequent inaction was so out of balance with the danger posed to Stewart that it amounted to willful and wanton conduct.

¶ 109                                          4. Final Points

¶ 110    We note that the First District in *Tagliere* rejected *Burlingame*'s guideline. *Tagliere*, 408 Ill. App. 3d at 244. As we have recounted (*supra* ¶ 79), the *Tagliere* court ruled that the

statutory definition of willful and wanton conduct applies to the exclusion of any common-law definitions, even those that are not necessarily inconsistent. *Tagliere*, 408 Ill. App. 3d at 244-45. The *Tagliere* court characterized the *Burlingame* guideline as a "definition" and, in so doing, rejected it. *Id.*

¶ 111    We disagree with the *Tagliere* court's rejection of the *Burlingame* guideline. The *Burlingame* court specified that its guideline set forth "guidance," not a definition. *Burlingame*, 293 Ill. App. 3d at 934. Its guidance in no way conflicts with the statutory definition of willful and wanton conduct. In fact, in suggesting that the complained-of omission should "shock the conscience," *Burlingame* helped to preserve a high standard for willful and wanton conduct consistent with utter indifference and conscious disregard.

¶ 112    We prefer the *Burlingame* guideline to a similar guideline cited by the Estate and complained of extensively by the District in its reply brief and at oral argument. That is: "a failure, after knowledge of impending danger, *to exercise ordinary care* to prevent it or a failure to discover the danger through recklessness or carelessness when it could have been discovered by the exercise of ordinary care." (Emphasis added and internal quotation marks omitted.) *Murray*, 224 Ill. 2d at 236 (quoting *Schneiderman v. Interstate Transit Lines, Inc.*, 394 Ill. 569 (1946)). The District argues that this common-law guideline conflicts with the statutory definition of willful and wanton conduct and that, thus, we should not follow it.

¶ 113    We agree that *Schneiderman*'s 1946 language is, *arguably*, problematic. It refers to ordinary care, and, typically, the failure to exercise ordinary care substantiates a negligence claim, not a willful-and-wanton claim. See, *e.g.*, *Colburn v. Mario Tricoci Hair Salon & Day Spas, Inc.*, 2012 IL App (2d) 110624, ¶ 36 (in a negligence case, the standard of care required of a defendant is to act as an ordinary careful person would in like circumstances). Appellate courts continue to use this common-law guideline, but we have not seen the supreme court apply it to claims brought under the post-1998 version of the Act. The import of the *Schneiderman* guideline is that, in the face of a known danger, the failure to perform a simple preventative act can, depending on the circumstances, constitute willful and wanton conduct. This, in itself, is not incorrect. However, courts must be careful as to how they express this proposition, and they cannot allow for a failing that amounts to simple negligence to substantiate a willful-and-wanton claim.

¶ 114    In any case, no error occurred here. The jury received the statutory definition of willful and wanton conduct, not the complained-of *Schneiderman* guideline. Likewise, the complained-of guideline did not influence our analysis. The District contends that the guideline, in its laxity, allows for the case to turn on Harper's prior knowledge of Stewart's asthma and his failure to properly diagnose the asthma attack, find his inhaler, or perform CPR. We disagree. Instead, we recognize that those earlier omissions combined with the much larger omission of failing to call 911.

¶ 115    Next, the District argues that, if we affirm the jury's decision here, we will create a burdensome policy of requiring an educator to call 911 each time a student faces harm. We disagree. First, the District already has a policy that an educator must call 911 in response to a medical emergency. Second, each case is *sui generis*. Each jury will evaluate the unique facts before it. Here, Harper certainly faced a medical emergency, with a student fighting for his life. Yet, Harper pursued a course of action that he must have known would result in a several-minute delay before a medical professional could provide instruction or aid. Under

- 20 -

these circumstances, the jury could reasonably find that Harper's course of action was willful and wanton.

¶ 116    The District also argues that the Estate's cases are distinguishable because they involve a paramedic's limited immunity pursuant to section 3.150 of the Emergency Medical Services Systems (EMS) Act (210 ILCS 50/3.150 (West 2008)). Section 3.150 states that any person authorized to provide medical services under the EMS Act cannot be liable for his act or omission unless it constitutes willful and wanton conduct. *Id.* In *Kirwan*, for example, the plaintiff stated a cause of action where the paramedics failed to timely administer epinephrine for an allergic reaction. Here, in contrast, Harper's failure to timely administer the asthma inhaler did not by itself substantiate the willful-and-wanton claim. Rather, it was Harper's continuing failure to timely secure appropriate medical assistance by calling or directing someone to call 911 that primarily substantiated the willful-and-wanton claim.

¶ 117    This distinction between a paramedic and a teacher gives us pause, but it does not mandate a different outcome. Though the Estate's cases involved paramedics and this case involves a teacher, both the paramedics there and the teacher here failed to follow policies dictating the appropriate responses to the respective situations in manners that rose to the level of willful and wanton conduct. The instant case involved a medical emergency, but the most devastating omission, failing to call 911, did not require any medical training. Rather, even young children are generally credited with knowing to call 911 in response to a medical emergency. Thus, we do not find controlling Harper's status as a nonmedical professional.

¶ 118    In sum, actions in tort allege a breach of duty, and the relationship between the parties influences the nature of the duty. See *Doe-3*, 2012 IL 112479, ¶ 18. In the tort context, a teacher's relationship to a student is one of *in loco parentis*. 105 ILCS 5/24-24 (West 2008); *Courson*, 301 Ill. App. 3d at 755. Thus, while we have no doubt that Harper, the person, cared for Stewart, the person, sufficient evidence supports that, as a teacher responding to a student, Harper responded in a willful and wanton manner.

¶ 119                              B. Jury Instruction

¶ 120    The District argues that it is entitled to a new trial based on an erroneous jury instruction. Issuing jury instructions is within the court's discretion. *Studt v. Sherman Health Systems*, 2011 IL 108182, ¶ 13. To give a jury instruction, there must be some evidence to support the instruction. *Heastie v. Roberts*, 226 Ill. 2d 515, 543 (2007). We will reverse only where an erroneous instruction leads to serious prejudice. *Clarke v. Medley Moving & Storage, Inc.*, 381 Ill. App. 3d 82, 91 (2008).

¶ 121    Specifically, the District finds fault with the trial court's instruction that the jury could find that the District acted willfully and wantonly if it "*prevent[ed]* [Stewart] from obtaining prompt and appropriate medical care" or "fail[ed] to provide immediate medical care" in a manner that was willful and wanton. (Emphasis added.) The District takes particular issue with the word "prevent," because there was no evidence that Harper "prevented" medical care. Although the District generally objected to the instruction at trial, it did not specifically object to the word "prevent," and it did not provide an alternative instruction. Thus, barring plain error, this issue is forfeited. See, *e.g.*, *People v. Herron*, 215 Ill. 2d 167, 175 (2005). Here, there was no error, let alone plain error. There *was* evidence to support the instruction, and there was no prejudice.

¶ 122    There was evidence to support the instruction. First, we note that, by isolating the word "prevent," the District misconstrues the meaning of the instruction. In discussing the instruction, the Estate argued that "preventing" and "failing to provide" were two ways of saying the same thing. The court agreed and instructed that the jury could find that the District acted willfully and wantonly if the District "prevent[ed] [Stewart] from obtaining prompt and appropriate medical care" *or* "fail[ed] to provide immediate medical care" in a manner that was willful and wanton. Even looked at in isolation, "prevent" can mean "to deprive of power or hope of acting or succeeding." Merriam-Webster Online Dictionary, http://www.merriam-webster.com/dictionary/ prevent (last visited July 6, 2016). There *was* evidence to support that definition of "prevent"—the jury may have found that, by failing to call 911, Harper "deprived" Stewart of the "hope" of "successful" treatment.

¶ 123    In any case, the District has not shown prejudice. The District states that the definition of "prevent" is "to stop (something) from happening or existing." *Id.* We agree that the evidence does not support this definition of "prevent." Clearly, Harper did not physically stop anyone else from securing or providing care for Stewart. However, there is nothing in the record to show that the jury's decision turned on this definition of "prevent." Even if it had, this definition of "prevent" would only have made it more difficult for the Estate to prove its case. There was no prejudice.

¶ 124                          C. No Absolute Immunity Pursuant to Section 2-201

¶ 125    Finally, the District argues that this case never should have gone to trial. It contends that it should *not* have been subject to the *limited* immunity afforded by section 3-108(a) of the Act and section 24-24 of the Code, which provide immunity for negligent conduct but not for willful and wanton conduct. 745 ILCS 10/3-108(a) (West 2008); 105 ILCS 5/24-24 (West 2008). Rather, it should have been subject to the *absolute* immunity, even for willful and wanton conduct, afforded by section 2-201 of the Act for policy determinations made with discretion. 745 ILCS 10/2-201 (West 2008). The trial court denied the District's motion for summary judgment on the issue of absolute immunity. It determined that, although Harper exercised his discretion, it could not say as a matter of law that Harper made a policy determination. After addressing the Estate's jurisdictional and forfeiture arguments, we review the court's decision.

¶ 126                                        1. Jurisdiction

¶ 127    The Estate argues, as to this issue only, that we do not have jurisdiction because the District did not specify the summary judgment ruling in its notice of appeal. We disagree that the District's failure to specifically mention the summary judgment ruling deprives us of jurisdiction.

¶ 128    Notices of appeal are liberally construed in Illinois, particularly where the opposing party has not been prejudiced. *Burtell v. First Charter Service Corp.*, 76 Ill. 2d 427, 436 (1979); *Dowell v. Bitner*, 273 Ill. App. 3d 681, 689 (1995). "[A]n appeal from a final judgment draws into issue all prior nonfinal orders [that] produced the final judgment." *Dowell*, 273 Ill. App. 3d at 688. An appellate court may review an interlocutory order not specified in the notice of appeal if that decision was a step in the procedural progression that led to the final judgment. *Burtell*, 76 Ill. 2d at 434-35. When a partial summary judgment ruling narrows the issues that go to trial, it is necessarily a step in the procedural progression. *Dowell*, 273 Ill. App. 3d at 689.

¶ 129 Here, the notice of appeal referenced the jury's decision on the willful-and-wanton claim. The summary judgment decision directly addressed an affirmative defense to said willful-and-wanton claim. The summary judgment decision ultimately led to the resolution of the willful-and-wanton claim because it prompted a trial on the willful-and-wanton claim. We have jurisdiction to address the District's legal argument that the trial court should have found it immune to allegations of willful and wanton conduct.

¶ 130                         2. Forfeiture and the Scope of Our Review

¶ 131 Next, without using the word "forfeit," the Estate essentially argues that the District forfeited its challenge. Indeed, after the trial court declined to decide at the summary judgment stage that the District had absolute immunity, the District could have pursued a fact-based consideration of the issue at trial, but it did not. Therefore, we agree that a consideration of the issue based on the evidence adduced at trial, if any, is forfeited. See, *e.g.*, *Mabry v. Boler*, 2012 IL App (1st) 111464, ¶ 15 (issues not raised at trial are forfeited).

¶ 132 However, the District has *not* forfeited a limited review of whether the trial court erred by declining to decide, based on the evidence presented at the summary judgment stage only, that the District had absolute immunity because it made a policy determination. In other words, *if* we agree with the trial court that the District did not establish absolute immunity as a matter of law, we may not proceed to consider whether the facts adduced at trial later established that Harper made a policy decision. However, we may consider whether we agree with the trial court in the first place because, if we do not, the case never should have proceeded to trial. Thus, we address the merits of the District's argument.

¶ 133                                     3. The Merits

¶ 134 Summary judgment is appropriate only when the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2008). Here, the issue at the summary judgment stage involved absolute immunity. To be subject to absolute immunity under section 2-201, the challenged conduct must involve a (1) policy determination and (2) discretion. *Van Meter v. Darien Park District*, 207 Ill. 2d 359, 373 (2003). In the instant case, the trial court determined at the summary judgment stage that it could not say as a matter of law that Harper made a policy determination.

¶ 135 A policy determination is one where the public employee balances competing interests and makes a judgment call as to what solution will best serve those interests. *Harinek v. 161 North Clark Street Ltd. Partnership*, 181 Ill. 2d 335, 342-43 (1998). The District argues that Harper made a policy determination because he chose between following a policy to call the nurse and following a policy to call 911.

¶ 136 The District likens this case to *Harrison v. Hardin County Community Unit School District No. 1*, 197 Ill. 2d 466 (2001). In *Harrison*, the principal, not a teacher, made a determination to issue an early release due to inclement weather to all students who drove to school that day. *Id.* at 468-69. The principal did not allow the plaintiff to leave earlier than any of the other students who drove to school that day. *Id.* The plaintiff was released at the same time as the other students, and on the way home, he lost control of his vehicle and sustained injuries. *Id.* The plaintiff sued, alleging that the principal's early-release determination proximately caused

- 23 -

the accident. *Id.* The court held that the school district had absolute immunity because the principal's early-release determination had been a policy determination. *Id.* at 474.

¶ 137     *Harrison* does not compel us to reverse. Here, there was evidence presented at the summary judgment stage that Harper, as a teacher, violated existing policy. He did not determine policy; he failed to follow existing policy. It certainly cannot be said, as a matter of law, that Harper made a policy determination. Therefore, we affirm the trial court's denial of the District's motion for summary judgment on the issue of absolute immunity.

¶ 138                                            **III. CONCLUSION**

¶ 139     For the aforementioned reasons, we affirm the trial court's judgment.

¶ 140     Affirmed.